UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
CONAN PROPERTIES INTERNATIONAL LLC
and ROBERT E. HOWARD PROPERTIES INC.,

                                 Plaintiffs,

            -against-

RICARDO JOVÉ SANCHEZ,

                                Defendant.
----------------------------------------------------------------x

                                                 REPORT AND
                                                 RECOMMENDATION

                                                 17-CV-162 (FB)

ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:

      On January 11, 2017, plaintiffs Conan Properties International LLC ("CPI") and

Robert E. Howard Properties Inc. ("REHP") (together, "plaintiffs") filed this action against

Ricardo Jové Sanchez ("defendant"), seeking damages and injunctive relief, for copyright

infringement pursuant to the Copyright Act, 17 U.S.C. § 501(a), unfair competition pursuant

to the Lanham Act, 15 U.S.C. § 1125(a), and trademark infringement as well as unfair

competition pursuant to New York common law, see ITC Ltd. v. Punchgini, Inc.,

9 N.Y.3d 467, 476-80 (2007).   See Complaint ("Compl.") (Jan. 11, 2017) ¶¶ 32-53,

Electronic Case Filing ("ECF") Document Entry ("DE") #1.   When defendant failed to

answer or otherwise appear in this case, the Clerk of Court entered his default on July 5, 2017.

See Clerk's Entry of Default (July 5, 2017) ("Entry of Default"), DE #15.   Plaintiffs

subsequently moved for default judgment under Rule 55(b)(2) of the Federal Rules of Civil

Procedure, see Motion for Default Judgment (Sept. 15, 2017), DE #13; see also Memorandum

in Support (Sept. 15, 2017) ("Pl. Mem."), DE #18; Supplemental Memorandum in Support

(Jan. 25, 2018) ("Pl. Supp. Mem."), DE #29, and the Honorable Frederic Block referred the

motion to the undersigned magistrate judge for a report and recommendation, see Electronic

Order Referring (Sept. 15, 2017).

For the reasons set forth below, this Court respectfully recommends that plaintiffs'

motion be granted in part and denied in part.   More specifically, this Court concludes that

plaintiffs have adequately pled infringement of only three copyrighted works and have

adequately pled unfair competition under federal law.   In addition, plaintiffs' evidentiary

submissions only partially support their request for monetary relief and do not support their

request for injunctive relief.

## THE UNDERLYING FACTS

I.     **Plaintiffs and Their Copyrights and Trademarks**

Plaintiffs are in the film and television industry, where they market goods portraying

the characters created by author Robert E. Howard.   See Compl. ¶ 9.   In the 1930s, Robert

Howard wrote, and published in "pulp fiction" magazines, fantasy stories involving Conan the

Barbarian, Kull of Atlantis, Almuric (also known as Ironhand),[1] Bran Mak Morn, Dark

Agnes, El Borak, Solomon Kane, and others.   See id. ¶ 8.   These characters have since been

portrayed in "numerous other works, including books, toys, comic books, video games, cover

art, films and television series."   Id. ¶ 11; see id. ¶ 17.

---

[1] In their Complaint and initial motion papers, plaintiffs refer to this character as "'Almuric' a/k/a 'Ironhand,'" Compl. ¶ 8; Pl. Mem. at 2, but then refer to him as "Ironhand a/k/a Esau Cairn" in their supplemental motion papers, see Pl. Supp. Mem. at 5, wherein they clarify that the character is "from the planet Almuric" and was portrayed in "the Almuric anthology of stories[,]" id. (citing 89-page exhibit without pincite).   This opinion will refer to the character as "Ironhand."

2

Plaintiffs purport to own the copyrights in each of these characters as well as in the underlying works that portray these characters.   See id. ¶ 9.   The claims of copyright for the underlying literary works in which these characters were first described (i.e., the pulp fiction magazines) were registered in the 1930s and renewed in or around the 1960s with the United States Copyright Office (the "Copyright Office").   See generally Compl. Exhibit ("Ex.") B, DE #1-2; Compl. Ex. D, DE #1-4.   The registration and renewal documents notate that those copyrights were owned by third parties.   See, e.g., Declaration in Support (Jan. 25, 2018) ("Malmberg Supp. Decl.") Ex. 1(1) at 13-15, DE #30-1[2] (noting that the copyright in "Weird Tales, vol. 20 num. 6," was registered by Popular Fiction Publishing Company and renewed by Steinberg Press, Inc.).   Plaintiffs declare that they and their parent company, Cabinet Licensing, LLC ("Cabinet"), have since acquired ownership of these and other copyrights. See Malmberg Supp. Decl. ¶ 4, DE #30; see also id. ¶ 1.   Indeed, plaintiffs themselves are reflected in more recent copyright registrations as having acquired the copyrights in the "numerous other works" in which the characters have been subsequently depicted.   See generally Compl. Ex. C, DE #1-3.[3]   Collectively, plaintiffs assert that they own more than 900 different copyrights.   See generally Compl. Ex. B, Ex. C, Ex. D.

---

[2] This opinion references the page numbers electronically imprinted by the ECF docketing system in its citations to exhibits to the Complaint and various sworn statements.   Where the cited exhibit was docketed into ECF in multiple parts, the citation to that exhibit is followed by a parenthetical containing the number identifying the referenced part (e.g., "Malmberg Supp. Decl. Ex. 1(1) at 13-15").

[3] The records of the Copyright Office that correspond to plaintiffs' registration numbers reflect the existence of various derivative works for which plaintiffs expressly disclaimed authorship in the preexisting novels that featured the characters at issue.   See, e.g., Compl. Ex. B (Title: Phoenix on the Sword); Compl. Ex. C at 26 (Title: King Conan: The Phoenix on the Sword Part 1 of 4; Registration No.: TX7652424); COPYRIGHT, Search Copyright Records, Registration Number TX0007652424 (last visited on June 8, 2018), https://www.copyright.gov/ ("King Conan Registration") (Title: King Conan; Published: 2012; Copyright Claimant: Conan Properties International LLC, Transfer: By written

Plaintiffs have also registered with the United States Patent and Trademark Office marks that incorporate the names of various of these characters.   See generally Compl. Ex. E, DE #1-5.   These registered trademarks include CONAN, KULL, EL BORAK, DARK AGNES, and SOLOMON KANE.   See Compl. ¶ 16.   Further, plaintiffs registered with the World Intellectual Property Organization and European Union Intellectual Property Office the marks ALMURIC (the title of the stories in which, plaintiffs assert, Ironhand was portrayed) and BRAN MAK MORN.   See Compl. Ex. E at 3, 6; Malmberg Supp. Decl. Ex. 3(1) at 3, DE #30-5; id. Ex. 4(1) at 7, DE #30-7; Pl. Supp. Mem. at 5.   These marks cover products such as toys, books, and role-playing games.   See Compl. ¶¶ 11, 17.

## II.   Defendant and the Purported Infringement

Defendant is an amateur sculptor from Spain who, in 2016, created miniature figurines that, plaintiffs assert, depict the above characters.   See id. ¶¶ 7, 27; see also Compl. Ex. A at 3, DE #1-1.   Defendant began a campaign on Kickstarter, "a popular crowd-funding Website headquartered in Brooklyn, New York[,]" in which he requested financial support from the public to fund his creation of the figurines.   See Compl. ¶ 21.[4]   Depending on the amount of money pledged, each backer was to receive different rewards in return.   See Compl. Ex. A at 5-6.   For example, for 27 Euros (or approximately $33), a backer would receive three figurines.   See id. at 5.   One who pledged 9,000 Euros (over $11,000) would receive a special miniature figurine of Conan the Barbarian as inspired by Arnold

---

agreement; Authorship: Contribution to Collective Work; Pre-existing Material: Novels Featuring the Conan Character).

[4] The Complaint does not allege that defendant actually received any pledged funds or that his figurines were actually distributed.

Schwarzenegger's 1982 movie.  See id. at 6.  In addition to placing sample images of his

figurines on Kickstarter, the Complaint alleges that defendant also placed the images on

Facebook, a "popular social media platform[.]"  See Compl. ¶ 22.  These images were

affixed with the names of the at-issue characters, except for Ironhand, for which defendant

used the title of the pulp fiction magazine in which Ironhand was portrayed.  See Compl. ¶ 24;

Pl. Supp. Mem. at 5; see generally Compl. Ex. F, DE #1-6.

In response to these activities, plaintiffs "submitted a takedown notice to Kickstarter

pursuant to the Digital Millennium Copyright Act . . . , 17 U.S.C. § 512[.]"[5]  Compl. ¶ 26.

On November 2, 2016, "Kickstarter informed Plaintiffs that Defendant had filed a counter-

notification" in which defendant declared under penalty of perjury that he owned the

copyrights covering "all the material displayed in [his Kickstarter] campaign . . . and [that] the

campaign [used] no names or trademarks of another company."[6]  Id. ¶ 27.  Defendant

subsequently removed the character names from the images on Kickstarter and replaced them

with generic ones.  See id. ¶ 28.  For example, defendant replaced the mark CONAN THE

---

[5] Section 512(c)(1) of the Copyright Act limits the liability of a service provider (here, Kickstarter) that, among other things, "upon notification of claimed [copyright] infringement . . . , responds expeditiously to . . . disable access to" the infringing material.  Such a notification is referred to as a takedown notice.  See 17 U.S.C. § 512(c)(3).

[6] If, upon the disabling of access to material subject to a takedown notice described supra n.5, the subscriber (here, defendant) of the service provider (here, Kickstarter) asserts a counter notification that its material does not infringe, the service provider must cease disabling access to the material and notify the person who issued the initial takedown notice (here, plaintiffs) of the counter notice.  See 17 U.S.C. §§ 512(g)(1)-(3).  The person who issued the initial takedown notice may then prevent the service provider from re-enabling access to the subscriber's purportedly infringing material by notifying the service provider of the filing of "an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network." See id. § 512(g)(2)(C).

BARBARIAN with the mark THE BARBARIAN.   See Compl. Ex. G, DE #1-7.   The underlying images, however, remained the same.   See Compl. ¶ 29.

## PROCEDURAL POSTURE

Plaintiffs commenced this copyright and trademark action against defendant on January 11, 2017.   See generally Compl.   On January 12, 2017, plaintiffs attempted to serve defendant pursuant to the Hague Convention, both "by international postal mail and electronic transmission."   See Declaration of Frank D. D'Angelo (Sept. 15, 2017) ("D'Angelo Decl.") ¶ 5, DE #21.   "Defendant acknowledged receipt of the Summons and Complaint by electronic transmission" on January 16, 2017, "and, in the same email, inquired as to the cost of a license to exploit Plaintiffs' 'Conan' works."   Id. ¶ 6; see Compl. ¶ 31.   Plaintiffs' counsel responded that "any resolution will have to be made in the context of the action[,]" D'Angelo Decl. Ex. 5, but received no response from defendant, see D'Angelo Decl. ¶¶ 7-9.

Plaintiffs again attempted to serve defendant on April 4, 2017 by international postal mail.   See id. ¶ 10.   Plaintiffs requested, but did not receive, proof of receipt.   See id. Plaintiffs again served defendant on May 3, 2017, this time receiving proof of receipt, see id. ¶ 11; Summons (May 8, 2017), DE #8, and, on June 9, 2017, this Court concluded that "service on defendant was proper[,]" Electronic Order (June 9, 2017).

Upon defendant's failure to answer or otherwise defend this case, the Clerk of the Court entered his default on July 5, 2017.   See Entry of Default.   Plaintiffs subsequently moved for default judgment, see generally Pl. Mem., and served their motion papers on defendant, see Affidavit (Sept. 15, 2017), DE #27.   Defendant never responded to this Court's

order to show cause "why the relief requested in plaintiffs' motion papers . . . should not be granted." See Order To Show Cause (Oct. 13, 2017), DE #24.

On December 5, 2017, this Court directed plaintiffs to supplement their submissions in order to cure deficiencies with respect to liability and remedies. See Order To Show Cause (Dec. 5, 2017) ("Order To Show Cause") at 4-5, DE #25. Plaintiffs submitted to the Court, and served on defendant, see Affidavit of Service (Jan. 26, 2018), DE #31, nearly 800 pages of supplemental submissions, most of which are excerpts from Robert Howard's initial stories describing the characters in dispute, see generally Malmberg Supp. Decl. & attached exhibits. Defendant failed to respond to plaintiffs' supplemental submissions.

## DEFAULT JUDGMENT STANDARD

Where the "plaintiff's claim is [not] for a sum certain[,]" the plaintiff seeking default judgment against a defendant who failed to answer or otherwise defend the case "must apply to the court" after "the clerk enter[s] the [defendant's] default." Fed. R. Civ. P. 55(a)-(b). A defendant's "default is deemed to constitute a concession of all well pleaded allegations of liability[.]" Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). The court need not, however, "agree that the alleged facts constitute a valid cause of action[.]" See TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd., 536 F.App'x 45, 46 (2d Cir. 2013) (internal quotation marks and citations omitted). Indeed, "before a district court enters a default judgment, it must determine whether the allegations in a complaint establish the defendant's liability as a matter of law." Taizhou Zhongneng Imp. & Exp. Co., Ltd v. Koutsobinas, 509 F.App'x 54, 56 (2d Cir. 2013) (citing Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009)). To the extent that the plaintiff's allegations are inadequate, "a district

court has discretion under Rule 55(b)(2) . . . to require proof of necessary facts" to satisfy itself that there is "a valid cause of action[.]" Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); accord Finkel, 577 F.3d at 87.[7]

"When deciding a [defendant's liability on a] motion for default judgment, courts have . . . looked to recent precedent with regard to surviving a Rule 12(b)(6) motion to dismiss[.]" Chanel, Inc. v. Louis, No. 06-cv-5924 (ARR)(JO), 2009 WL 4639674, at *3 (E.D.N.Y. Dec. 7, 2009). On a Rule 12(b)(6) motion, courts follow a two-prong approach. See Ashcroft v. Iqbal, 556 U.S. 662, 677-80 (2009). First, the complaint's conclusions of law and formulaic recitations of elements of a cause of action should be disregarded. See id. Second, where the complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). While "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S.

---

[7] Accordingly, in upholding a district court's refusal to vacate a default judgment, the Second Circuit has observed that a finding of liability on default may be based on "the factual allegations in the complaint, combined with uncontroverted documentary evidence submitted by plaintiffs . . . ." Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC, 779 F.3d 182, 189 (2d Cir. 2015); see id. at 188; Herrera v. Tri-State Kitchen & Bath, Inc., No. 14-CV-1695 (ARR)(MDG), 2015 WL 1529653, at *5 n.1 (E.D.N.Y. Mar. 31, 2015); see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) ("It is well settled that in ruling on [a motion to dismiss], a district court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.").

at 556).   For mixed questions of law and fact, the inquiry is whether the plaintiff sufficiently alleged underlying facts to plausibly support its conclusions of law.   See, e.g., Cintas Corp. v. Unite Here, 355 F.App'x 508, 510 (2d Cir. 2009) (affirming, in a trademark infringement action, the district court's holding that the plaintiff failed to plead sufficient facts supporting the plausibility of a likelihood of confusion).   The Supreme Court has invited courts, in assessing the sufficiency of pleadings, to use their "judicial experience and common sense." Iqbal, 556 U.S. at 679.

Although, in deciding motions for default judgment, courts assume the truth of the pleadings' well-pled facts as they relate to liability, the facts alleged in the pleadings are not assumed to be true in assessing plaintiffs' right to the relief requested.   See Au Bon Pain, 653 F.2d at 65.   In other words, even if the defendant is found to be liable, the defendant's default is not considered an admission of the plaintiff's entitlement to an award of damages or requested injunction.   See Greyhound Exhibitgroup, 973 F.2d at 158; S.E.C. v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975) (holding that a district court must, after finding a defendant in default, make factual findings regarding the appropriateness of injunctive relief).   Instead, the relief requested must "be established by the plaintiff" with evidence, Greyhound Exhibitgroup, 973 F.2d at 158, and may not exceed "what is specified in the [complaint's] 'demand for judgment,'" Silge v. Merz, 510 F.3d 157, 160 (2d Cir. 2007). In this regard, the court may rely on "detailed affidavits and documentary evidence" and need not conduct an evidentiary hearing on the appropriateness of the relief requested.   See Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 39-40 (2d Cir. 1989).

## LIABILITY

**I.     Plaintiffs' Claim for Copyright Infringement**

Plaintiffs assert a claim for copyright infringement pursuant to section 501 of the Copyright Act, 17 U.S.C. § 501(a).   <u>See</u> Compl. ¶¶ 32-40; Pl. Mem. at 5-6; Pl. Supp. Mem. at 2-6.   In order to establish a defendant's liability for copyright infringement, a plaintiff must show that (1) the plaintiff owned (2) a valid copyright (3) at the time the defendant actually copied from that copyright's associated work, and (4) this copying was wrongful because a substantial similarity existed between the defendant's work and the protectable elements of the plaintiff's.[8]   <u>See</u> <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991); <u>Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.</u>, 602 F.3d 57, 63 (2d Cir. 2010) (clarifying that, in the Second Circuit, copying is divided into two parts: actual copying and illegal copying).   Courts use the verb "copying" in this context as shorthand for the exploitation of any of the exclusive rights described in section 106 of the Copyright Act—that is, the right to reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, the copyrighted work.   <u>See</u> 17 U.S.C. § 106; <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 117 (2d Cir. 2010).   In addition, section 411 of the Copyright Act requires registration or preregistration as an element of a copyright owner's infringement claim.   <u>See</u> 17 U.S.C. § 411(a); <u>DRL Software Sols., LLC v. JourneyPure, LLC</u>, 17cv9125(DLC), 2018 WL 1276856, at *1 (S.D.N.Y. Mar. 8, 2018); <u>K-Beech, Inc. v. Does 1-29</u>, No. CV 11-3331(JTB)(ETB), 2011 WL 4401933, at *1-2 (E.D.N.Y. Sept. 19, 2011).

---

[8] The existence of a license is an affirmative defense.   <u>See</u> <u>Bourne v. Walt Disney Co.</u>, 68 F.3d 621, 630 (2d Cir. 1995).

The copyright claim in plaintiffs' Complaint implausibly asserts, in blunderbuss fashion, that defendant's handful of figurines infringed a total of 911 of plaintiffs' copyrights—in a multitude of characters and in numerous underlying works that portray those characters. See Compl. ¶¶ 8-14, 32-40; Pl. Mem. at 1-6.   Most of plaintiffs' referenced copyrights are in derivative works, such as in revisions to preexisting comic books that had incorporated earlier novels that featured the characters at issue.   See, e.g., King Conan Registration, *supra* p.3 n.3; see also 17 U.S.C. § 101 (defining collective works and derivative works).   But such copyrights do not extend protection to the preexisting characters that plaintiffs allege defendant copied, see 17 U.S.C. § 103; Compl. ¶ 21, and nothing in the Complaint suggests defendant's figurines incorporate any expression original to plaintiffs' derivative works, see Conan Properties, Inc. v. Mattel, Inc., 601 F.Supp. 1179, 1182 (S.D.N.Y. 1984) ("CPI's copyrights in their derivative works may not be protected beyond the extent of CPI's own material contributions. Any preexisting material CPI used in the works is unprotected.").   Further, the few purported character copyright infringements that are not patently implausible nevertheless appear to be inadequately pled, prompting the issuance of this Court's Order To Show Cause. In response, plaintiffs' supplemental motion papers expressly narrow their claim of infringement from 911 separate copyrights to the copyrights in seven characters (hereinafter the "at-issue characters").   See Pl. Supp. Mem. at 1.   Plaintiffs have thus abandoned their other allegations of copyright infringement.   Cf. Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014) (noting that a partial opposition may constitute abandonment of undefended claims).

In the sections below, this Court addresses each of the elements of plaintiffs' copyright claim and whether they have been satisfied with respect to the seven at-issue characters.

A. **Plaintiffs' Ownership**

Assuming for the moment that there are valid copyrights in the seven characters, but see infra pp.15, 28-32, plaintiffs have, through their evidentiary proffer, plausibly shown their ownership of such copyrights.

A person may become the owner of a copyright in various ways, including by authorship and by voluntary conveyance. See 17 U.S.C. § 201. Specifically, the Copyright Act vests initial ownership of a copyright in the author or authors of the work. See id. § 201(a). "As a general rule, the author is the party who actually creates the work[.]" Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989); see id. (discussing the exception, not implicated here, for a work made for hire). A work is "created" when "it is fixed in a [material object] for the first time[.]" 17 U.S.C. § 101 (defining "created" and "copies"). Copyright ownership may also be transferred "by any means of conveyance[,]" 17 U.S.C. § 201(d), so long as it is "in writing and signed by the owner[,]" id. § 204(a).[9]

The ownership element of copyright infringement is rarely an issue at the pleading stage. Timely registration of a copyright is "prima facie evidence of . . . the facts stated in the certificate[,]" including ownership information. See 17 U.S.C. § 410(c). Even if the registration is not timely made, courts have discretion to afford such a certificate evidentiary weight. See id. Thus, ordinarily, at the pleading stage, a plaintiff plausibly establishes its

---

[9] The ownership of the copyrights in the at-issue characters' initial portrayals is governed by the 1909 Copyright Act, while the ownership of the copyrights in the later iterations of those characters is governed by the 1976 Act. See Shoptalk, Ltd. v. Concorde-New Horizons Corp., 168 F.3d 586, 590 (2d Cir. 1999). Nevertheless, the two statutes are, for present purposes, analogous in terms of ownership: under both statutes, a copyright's initial owner is its work's author, and the copyright may be transferred by a signed writing. Compare 17 U.S.C. § 201 (1976), with id. § 8 (1909) (author is owner), and id. § 42 (1909) (transfer by a signed writing).

copyright ownership by proffering a certificate of registration.   Registration is not, however, invariably required for the assertion of a copyright infringement claim.   See, e.g., 17 U.S.C. § 411(a) (providing exceptions and limitations to the registration requirement, including refusal of registration).   Where the plaintiff lacks such a certificate, or where the certificate held by the plaintiff reflects that a third party is the copyright's owner, the plaintiff must plead facts plausibly supporting its ownership under some theory of ownership.   See generally Getty Images (US) Inc. v. Advernet, Inc., 797 F.Supp.2d 399, 413-31 (S.D.N.Y. 2011); see also Buday v. New York Yankees P'ship, 486 F.App'x 894, 898-99 (2d Cir. 2012).

Here, the Complaint itself fails to plead facts supporting any reasonable inference that plaintiffs are the owners of the copyrights in the at-issue characters: the Complaint contains only conclusory assertions of ownership, see, e.g., Compl. ¶¶ 9-12, tracking the language of the first element for copyright infringement, which the Court disregards in addressing this motion, see Iqbal, 556 U.S. at 677-80.

To be sure, the pleading contains some facts relevant to ownership.   Plaintiffs allege that, in the 1930s, Robert Howard wrote literary works portraying the at-issue characters.   See Compl. ¶ 8.   Plaintiffs now argue that these works were the first instances in which the various characters became copyrightable.   See generally Pl. Supp. Mem.; see also id. at 5 n.4. With no allegations implicating a work-for-hire relationship, the Complaint supports that Robert Howard was the author of the characters, and thus he, not plaintiffs, was the initial owner of any corresponding copyrights.   See Compl. ¶ 9 (describing Howard as the author).

The pleading does not contain any facts relevant to plaintiffs' acquisition of copyright ownership by conveyance or by any other means of transfer.   See Conan Properties, 601

F.Supp. at 1181 n.1 ("It should be noted that CPI does not explain how it came to acquire [its purported copyrights]. Nowhere in its Amended Complaint does CPI refer to a transfer from either Howard or Lancer Books and Marvel Comics. There is, however, a vague reference to CPI's 'predecessors,' but no indication as to who they might be.").   Nor does the copyright registration and renewal information reflected in charts appended to the Complaint (see Compl. Ex. B, Ex. C, Ex. D) support plaintiffs' conclusory assertion of ownership.

As an initial matter, plaintiffs have neither alleged nor proffered evidence that they registered their character copyrights; nor could they plausibly do so, because the Copyright Office does not register copyrights in characters.   See U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §§ 313.4(H), 618.8(A)(8), 804.3(B), 911 (3d ed. 2017) (noting that the Copyright Office will not register claims of copyright in characters; the Copyright Office will register claims of copyright in the underlying literary or visual works that portray those characters, but will require the claimant to disclaim authorship in the character, limiting the registration only to the literal, particular expression embodied in the underlying works).   The charts attached to plaintiffs' Complaint thus relate to copyrights in the various underlying works that portray the at-issue characters, including the initial literary works in which the characters were purportedly created.   See Compl. Ex. B, Ex. C, Ex. D. But plaintiffs' ownership of the derivative works that subsequently portrayed the characters does not establish ownership over the preexisting characters.   See 17 U.S.C. § 103(b).   And the copyright registration and renewal documents for the initial literary works in which the characters were first portrayed reflect that third parties were the owners of those copyrights, not plaintiffs CPI or REHP.   See, e.g., Malmberg Supp. Decl. Ex. 1(1) at 13-15.

14

Because of these deficiencies, the Court directed plaintiffs to supplement their Complaint and moving papers.   See Order to Show Cause at 2.   In his supplemental declaration, Fredrik Malmberg, CEO of Cabinet, plaintiffs' parent company, declared under penalty of perjury that, several years ago, plaintiffs and Cabinet acquired by transfer all of the asserted copyrights, see Malmberg Supp. Decl. ¶ 4, with CPI owning the copyrights to the Conan-related works, and REHP owning the rights to the remaining at-issue characters, see id. ¶ 6; Compl. ¶¶ 10, 13.   This Court thus concludes that, in light of this uncontested proffer, and assuming copyrightability, it is plausible that, upon filing their Complaint, plaintiffs owned the at-issue character copyrights at the time of defendant's purported infringement.

## B.  Valid Copyright

In addressing ownership, this Court assumed the validity of the character copyrights— that is, that the at-issue characters were copyrightable.   However, as discussed below, the pleading, in conjunction with plaintiffs' evidentiary proffer, plausibly supports that only some of the at-issue characters—i.e., El Borak, Solomon Kane, and Kull—gained copyright protection.   As to those characters, it is plausible that the copyrights were still valid at the time of defendant's purported infringement.   See infra pp.34-36.

### 1.  Governing Law: Copyrightability Generally

Copyright protection subsists in (1) "works of authorship" (2) that have been "fixed in any tangible medium of expression" and (3) that are "original."   17 U.S.C. §§ 102(a), 302-305.   Copyright protection does not attach to facts or ideas.   See id. § 102(b).   These principles, codified in subsections 102(a) and 102(b) of the Copyright Act, highlight the idea/expression dichotomy.   See 17 U.S.C. § 102; Feist, 499 U.S. at 349-50.   That is,

copyright protects an author's expression of an idea, not the idea itself.   See Feist, 499 U.S. at 349-50.   Moreover, these copyrightability principles are, in varying degrees, constitutional limitations: "Congress shall have power to . . . promote the Progress of Science . . . by securing for limited Times to *Authors* . . . the exclusive Right to their . . . *Writings* . . . ." See U.S. Const. Art. I, § 8, cl. 8 (emphasis added); Feist, 499 U.S. at 346; Sid Bernstein Presents, LLC v. Apple Corps Ltd., No. 16 CIV. 7084 (GBD), 2017 WL 4640149, at *6 (S.D.N.Y. July 26, 2017).[10]

The definition of a "work of authorship" is not specifically set forth in the Copyright Act.   See generally 17 U.S.C. §§ 101-102; see also 1 Nimmer on Copyright ("Nimmer") § 2.03(A) (Matthew Bender, Rev. Ed. 2018) ("It is clear that this phrase is not intended to be coextensive with an author's 'writings' in the constitutional sense. That is, Congress elected in 1976 not to exercise its full authority to provide for copyright protection of all 'writings' (the same as it decided in 1909 when enacting the predecessor statute).").   The Copyright Act does, however, provide a non-exclusive list of illustrative categories of works of authorship subject to copyright protection, including literary and pictorial, graphic, and sculptural works, and the Second Circuit has acknowledged that categories of works not expressly provided for, but nevertheless analogous to those included, in this list may nevertheless be copyrightable.

---

[10] As with ownership, see generally *supra* p.12 n.9, the 1909 Act governs the copyrightability of some of the works in this case, and the 1976 Act governs others.   But for the prior Act's publication requirement, see 17 U.S.C. §§ 2, 9 (1909), the statutes are largely analogous with respect to copyrightability, compare id. § 4, with 17 U.S.C. § 102 (1976); see 2 Patry on Copyright ("Patry") § 3:22 (2018 ed.) ("The 1909 Act did not expressly require fixation. However, since that Act generally protected only published works, the requirement was implicit.").   Because plaintiffs plausibly alleged the general publication and proper notice of the at-issue characters' underlying works, see Compl. ¶¶ 8, 11; 17 U.S.C. §§ 2, 9 (1909), the distinction between the Acts is not material to the Court's analysis.

16

See 17 U.S.C. §§ 101, 102(a); Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 846-47 (2d Cir. 1997) (noting that the list of works in section 102(a) is "non-exclusive," but holding that a basketball game is not a "work of authorship" because it is not analogous to any of the works in this list).

"A work is 'fixed' in a tangible medium of expression when its embodiment in a [material object] . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated, for a period of more than transitory duration." 17 U.S.C. § 101 (defining "fixation" and "copies"). For example, a literary work is fixed when it is written down on a piece of paper; a pictorial work is fixed when it is painted on a canvas. See, e.g., Cohen v. G&M Realty L.P., Case No. 13-CV-05612(FB)(RLM), 2018 WL 851374, at *9-10 (E.D.N.Y. Feb. 12, 2018) (holding that various aerosol-based works of visual art were fixed when spray-painted on a building, despite the authors' intent that the works be temporary installations). By contrast, a work of authorship is not fixed where its original expression exists only in the author's mind. See Matthew Bender & Co. v. West Publ'g Co., 158 F.3d 693, 702-04 (2d Cir. 1998) (noting that the 1976 Act's definition of "copies" merely clarified that "fixation" only requires that the work be perceptible in some form by one's senses, even if such perception requires the aid of technology).

A work of authorship is "original" where it (1) "was independently created by the author" and (2) "possesses at least some minimal degree of creativity." Feist, 499 U.S. at 345. A work of authorship is "independently created" where the author created the work without copying from other works. See id.; see also Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir. 1980). Where an author does copy from preexisting material, the

author may nevertheless gain copyright protection in her ultimate work, depending upon, and limited to the extent of, the incremental additions of originality contributed by the author of the derivative work.  See 17 U.S.C. §§ 101, 103 (defining compilations and derivative works and clarifying their scope of protection); Matthew Bender, 158 F.3d at 680.   Accordingly, while an author does not independently create facts, see Feist, 499 U.S. at 361, the author may independently create a selection and arrangement of such facts, so long as she does so "without copying that selection or arrangement from another work[,]" id. at 358.

A work of authorship exhibits "minimal creativity" where its independently created material consists of more than mere trivial elements of expression.   See id. at 345 ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice.").   Expression that is "mechanical or routine" or is dictated by external, utilitarian demands is not minimally creative.   See id. at 362; id. at 363 (noting that a selection that "was dictated by state law" would "also fail the originality requirement").   Other aspects of expression that are not minimally creative include de minimis representations of expression, such as single words, titles, or names.   See Matthew Bender, 158 F.3d at 683; Eng v. Captain Blue Hen Comics, No. 14-CV-3631 (ENV)(LB), 2014 WL 2941280, at *3 (E.D.N.Y. June 30, 2014) (citing 37 C.F.R. § 202.1).   Expression that exceeds this "'modest,' 'minimal,' . . . 'low threshold,'" Durham, 630 F.2d at 910, satisfies the creativity requirement.

For example, the alphabetical arrangement of names in a phonebook is so routine in the genre and so dictated by audience expectations that, to the extent there is independently created expression in such an arrangement, the expression is trivial.   See Feist, 499 U.S. at 362.   Scènes à faire—that is, "incidents, characters or settings which are as a practical

matter indispensable, or at least standard, in the treatment of a given topic"—are likewise so routine in a given genre and so heavily dictated by audience expectations that they "are not copyrightable as a matter of law."   Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 979 (2d Cir. 1980) (collecting cases); see Effie Film, LLC v. Murphy, 564 F.App'x 631, 633 (2d Cir. 2014) (discussing Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir. 1986)).

At the pleading stage, the element of copyright validity is rarely an issue.   As with ownership, timely registration of a copyright constitutes "prima facie evidence of the validity of the copyright . . . ."   17 U.S.C. § 410(c).   Thus, typically, the submission of a certificate of registration suffices to plausibly allege copyright validity.   Where, in contrast, a plaintiff lacks a certificate of registration for the specific copyright it is seeking to enforce, the Second Circuit requires that the plaintiff plead sufficient, non-conclusory facts such that the validity of the copyright is plausible.   See Ochre LLC v. Rockwell Architecture, Planning & Design, P.C., 530 F.App'x 19, 20-21 (2d Cir. 2013) (affirming the district court's holding that the complaint failed to state a claim of copyright infringement because the plaintiff did not identify which of its light fixture's features were original and non-functional).   Merely alleging that the work of authorship features some material that is not protectable is insufficient.   See id.

### 2.   Governing Law: Copyrightability of Characters

The copyrightability of characters has continued to vex courts since Nichols v. Universal Pictures Corp., when Judge Learned Hand first noted the possibility of their independent copyrightability.   See 45 F.2d 119, 121 (2d Cir. 1930).   With respect to the "work of authorship" requirement, courts have overwhelmingly found that characters are copyrightable subject matter independent of the underlying works in which the characters are

19

portrayed, see, e.g., id.; see also Warner Bros. Inc. v. Am. Broad. Cos., Inc., 720 F.2d 231, 240-41 (2d Cir. 1983)—presumably as being analogous to literary and pictorial, graphic, and sculptural works, cf. Nat'l Basketball Ass'n, 105 F.3d at 846-47.

More specifically, a plaintiff may own a copyright in a character separately from, for example, the literary work in which the character is described.   See, e.g., Salinger v. Colting, 641 F.Supp.2d 250, 254 (S.D.N.Y. 2009) (holding that there were valid copyrights in both *Catcher in the Rye*, the literary work, and Holden Caufield, the character portrayed in that literary work), vacated on other grounds, 607 F.3d 68 (2d Cir. 2010).   Accordingly, the purported owner of a copyright in a character may assert a claim of infringement in that copyright even if the infringer did not appropriate any other material from the underlying literary work.   See Nichols, 45 F.2d at 121 (discussing character copyright infringement after holding that the defendant's silent film did not unlawfully appropriate a material degree of protected expression from the plaintiff's play); see generally Jessica Litman, Silent Similarity, 14 Chi.-Kent J. Intell. Prop. 11 (2014) (discussing Nichols); see also Zahr K. Said, Fixing Copyright in Characters: Literary Perspectives on A Legal Problem, 35 Cardozo L. Rev. 769, 779-80 (2013) ("Said") (referring to such infringement as "creative reuse" of characters).

The distinction between a character and its underlying work is difficult to conceptualize, and, in light of limited, sporadic caselaw, is worthy of elaboration.   Characters are difficult to conceptualize as existing separately from the larger works in which they are portrayed because they are abstractions of the literal elements of expression that, together, form their separate, underlying work.   See Warner Bros., 720 F.2d at 243 (characters are "an aggregation of the particular talents and traits his creator selected for him"); Nichols, 45 F.2d

20

at 121 (discussing protectable components of a play apart from dialogue, such as abstract components like characters and plot).[11]   The textual descriptions and visual depictions of a character generally warrant their own copyright as literary and pictorial, graphic, and sculptural works.   These literal elements of expression do not, however, constitute the character, but, like dialogue is to a play's plot, act as indicators of the abstract concept that is a character.   Whether these literal elements of expression sufficiently come together to warrant a copyright over the character portrayed is the inquiry at hand.

Courts throughout the United States, including in the Second Circuit, employ the "distinctively delineated" test in addressing the question of copyright protection for a character.   See Silverman v. CBS Inc., 870 F.2d 40, 50 (2d Cir. 1989) (noting that characters must be "sufficiently delineated"); Salinger, 641 F.Supp.2d at 254 (holding that the plaintiff's literary character had been distinctively delineated); Titan Sports, Inc. v. Turner Broad. Sys., Inc., 981 F.Supp. 65, 68 & n.1 (D. Conn. 1997); Burroughs v. Metro-Goldwyn-Mayer, Inc., 519 F.Supp. 388, 391 (S.D.N.Y. 1981), aff'd, 683 F.2d 610 (2d Cir. 1982).   Although infrequently discussed expressly in these terms, "delineation" and "distinctiveness" refer respectively to the "fixation" and "originality" issues uniquely associated with characters.   See

---

[11] Some scholars argue that, because characters are abstractions with fluid boundaries, the fixation of a character is impossible.   See Said, supra p.20 at 821-27.   Similarly, the Copyright Office does not view characters as copyrightable because, in its view, the independent protection of a character would attach copyright protection to the idea of a character, rather than to the particular expression of a character that would be portrayed in the literal elements of the character's underlying work.   See supra p.14.   Despite these naysayers, the Second Circuit has endorsed the view that characters are independently copyrightable.   See, e.g., Silverman v. CBS Inc., 870 F.2d 40, 50 (2d Cir. 1989).   The abstraction concern articulated by the opposing camp, and the difficulty in applying the idea/expression dichotomy in this context, lie at the crux of the caselaw in which courts have struggled to distinguish copyrightable from uncopyrightable characters.   See Warner Bros., 720 F.2d at 240-41 (noting abstraction issue).

generally Gaiman v. McFarlane, 360 F.3d 644 (7th Cir. 2004) (using the word "distinct" interchangeably with "original" in determining the copyrightability of characters).

In other words, the "delineation" inquiry essentially asks whether it can fairly be said that the author fixed in a tangible medium of expression the abstract concept that is a character. In making this determination, courts consider whether, through text or graphics or both, the author sufficiently described a character's conceptual as well as physical qualities.[12]  See DC Comics v. Towle, 802 F.3d 1012, 1021 (9th Cir. 2015); Warner Bros. Entm't v. X One X Prods., 644 F.3d 584, 597 (8th Cir. 2011); Gaiman, 360 F.3d at 661; see generally Sapon v. DC Comics, No. 00 CIV. 8992(WHP), 2002 WL 485730, at *3-4 (S.D.N.Y. Mar. 29, 2002) (noting Batman's conceptual as well as physical qualities); see also Warner Bros., 720 F.2d at 241 (noting that courts consider the visual aspects as well as attributes of a character).   In this way, the delineation requirement effectively ensures that the author defined the metes and bounds of a character.   A character's conceptual qualities include his age, name, "speech, movement, demeanor, and other personality traits . . . ."   X One, 644 F.3d at 598 (collecting cases).   A character's physical qualities include any of his visual characteristics, such as his clothing and facial features.   See id.

---

[12] Some courts have questioned whether literary characters—that is, characters that are described in text with little to no graphic depiction—are ever capable of gaining copyright protection.  See, e.g., D.C. Comics v. Towle, 802 F.3d 1012, 1019 (9th Cir. 2015).  Of course, as the following discussion illustrates, it may be easier for an author to delineate a character via graphics.  See Gaiman, 360 F.3d at 661.  That it is more difficult to sufficiently define the bounds of a character in words does not, however, impose a *per se* bar on a character's copyrightability in this Circuit.  See Silverman, 870 F.2d at 50 (holding that the Amos 'n' Andy characters "were sufficiently delineated in . . . *radio scripts* . . . ." (emphasis added)); Warner Bros., 720 F.2d at 240.

22

The exact point at which delineation can be said to occur is difficult to define.   The description or depiction of only nominal conceptual or physical qualities renders the material too thin to reasonably define the boundaries of a character.   Courts have found that one-off pictorial representations of a character, for example, are insufficient to establish the requisite delineation of a copyrightable character.   See X One, 644 F.3d at 600-01.   Although such a depiction likely includes a meaningful degree of physical qualities, it is almost certainly lacking sufficient conceptual qualities.   In this regard, the author would have described nothing more than the equivalent of a sculpture, not a character.   See id. (reasoning that movie posters did not support the copyrightability of characters they portrayed because they were "no more than pictures of the actors in costume" (internal quotation marks omitted)); cf. Nichols, 45 F.2d at 122 ("The [lover characters] are so faintly indicated as to be no more than stage properties. They are loving and fertile; that is really all that can be said of them.").

Scrupulously described conceptual characteristics with only nominal physical qualities have likewise been found to be insufficient to give rise to a copyrightable character.   See, e.g., Gaiman, 360 F.3d at 661 (noting that, in such a case, the character's verbal delineation was insufficient, but that, once depicted visually in a drawing, the additional physical delineation was sufficient to warrant copyright protection).   Without a detailed physical description or pictorial rendering, the author would have described nothing more than an amorphous set of traits for a kind of character rather than a specific one.   See id.

Stated differently, in terms embodied in the Copyright Act, see 17 U.S.C. § 102, the aforementioned characters are not copyrightable because they have not been fixed.   That said, some courts have found that a character is delineated if enough of the character's physical and

23

conceptual qualities have been defined such that the character would be readily identified if subsequently portrayed. See Towle, 802 F.3d at 1021 (noting that, in the Ninth Circuit, this is not only sufficient, but necessary).

The next step in the Court's analysis is the "distinctiveness" inquiry, which essentially asks whether the delineated character is original. A delineated character whose physical and conceptual qualities were merely copied from an historical or preexisting fictional character cannot be deemed distinctive. See Hoehling, 618 F.2d at 978 (historical events not copyrightable because they are historical facts); cf. Durham, 630 F.2d at 908-09 (plaintiff's wind-up toys of Disney characters not original derivative works). In section 102 terms, such characters would not be copyrightable because they are not original, in that the author did not independently create the character. Nevertheless, the addition of original qualities to the copied character may warrant protection for the additionally delineated material. See Silverman, 870 F.2d at 49-50.

In this connection, the character issues with which courts have most frequently grappled concern the creativity requirement. A delineated character that is merely a common "type" and is "stock" in its genre is not considered distinctive. See Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2003); see also Nichols, 45 F.2d at 122 (in opinion issued before creativity requirement was clarified in Feist and before development of scènes à faire doctrine, court assumes arguendo but casts doubt on originality of plaintiff's character: "It is indeed scarcely credible that[, in creating her work, the plaintiff] should not have been aware of those stock figures, the low comedy Jew and Irishman."). If the delineated qualities of a character are, as a practical matter, "indispensable and naturally associated with the treatment of a given

24

idea[,]" then, under the scènes à faire doctrine, the character is not copyrightable. See Rice, 330 F.3d at 1175. For example, a plaintiff cannot claim copyright protection over a character that "is dressed in standard magician garb—black tuxedo with tails, a white tuxedo shirt, a black bow tie, and a black cape with red lining—and [whose] role is limited to performing and revealing the magic tricks." Id. Nothing distinguishes that character "from an ordinary magician . . . ." Id.; see X One, 644 F.3d at 600 (holding that a movie poster featuring Tom and Jerry did not support character copyright because, in addition to failing the Eighth Circuit's "consistently delineated" test, discussed *infra* p.27 & nn.15-16, it "reveal[ed] no distinctive character or visual traits, but only visual characteristics typical to cats and mice"). Nor is the mere delineation of a character name sufficient to satisfy the distinctiveness requirement. See Captain Blue Hen Comics, 2014 WL 2941280, at *3 (name "Terrordactyl" insufficient to plausibly support originality). In section 102 terms, such characters are not copyrightable because they are not original, in that they are not minimally creative.

On the other hand, if the author delineated the character with anything beyond these stock, trivial elements of expression, the character would be plausibly copyrightable as at least minimally creative. See Detective Comics v. Bruns Publ'ns, 111 F.2d 432, 433 (2d Cir. 1940) (holding that the delineation of the various attributes of Superman resulted in more than a mere prototype Herculean hero); Gaiman, 360 F.3d at 660-61 (holding that Count Cogliostro, as verbally described and graphically drawn, had a specific name, age, appearance, title, speech, etc., and thus surpassed the stock character of an "old wino").[13]

---

[13] As these opinions reflect, the "distinctively delineated" test is not an aesthetic one in which copyright law demands some heightened degree of creativity so as to gain copyright protection in a character. See Gaiman, 360 F.3d at 660-62 (rejecting various attempts at imposing a heightened creativity

To be sure, it may be more difficult for an author to satisfy the fixation and originality requirements for a character than for other works of authorship.  See U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 305 (3d ed. 2017) (noting that generally, most, but not all, "works are fixed by their very nature").  These burdens are not, however, unique to characters, as evident in the copyrightability jurisprudence associated with compilations, see generally Feist, 499 U.S. at 344-54, the design of useful articles, see generally Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S.Ct. 1002 (2017); Ochre, 530 F.App'x at 20; derivative works, see generally L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486 (2d Cir. 1976) (en banc); and other forms of authorship in which an author's originality is difficult to define, and whose expression is inherently abstract, see generally Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992) (non-literal expression in computer programs).[14]

_____

requirement).  Indeed, as the Supreme Court has noted, courts should not play an active role in assessing and shaping aesthetic values in the creative arts.  See Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251-52 (1903) (discussing what has since been referred to as the "nondiscrimination principle").  Rather, the "distinctively delineated" test embraces purely technical, constitutional requirements.

[14] Nor are these burdens flaws in copyright law; rather, they are features intended to protect the public domain, which copyright law is constitutionally designed to foster.  See U.S. Const. Art. I, § 8, cl. 8 (Congress may provide copyright protection to "promote the Progress of Science"); see also Jessica Litman, The Public Domain, 39 Emory L.J. 965, 968-69 (1990) ("The public domain should be understood not as the realm of material that is undeserving of protection, but as a device that permits the rest of the system to work by leaving the raw material of authorship available for authors to use. . . . When individual authors claim that they are entitled to incentives that would impoverish the milieu in which other authors must also work, we must guard against protecting authors at the expense of the enterprise of authorship."); White v. Samsung Elecs. Am., Inc., 989 F.2d 1512, 1513 (9th Cir. 1993) (Kozinski, J., dissenting) ("Overprotecting intellectual property is as harmful as underprotecting it. Creativity is impossible without a rich public domain. Nothing today, likely nothing since we tamed fire, is genuinely new: Culture, like science and technology, grows by accretion, each new creator building on the works of those who came before. Overprotection stifles the very creative forces it's supposed to nurture.").

In addition to originality and fixation, some courts have imposed a further prerequisite to the copyrightability of characters, i.e., that the character's qualities be delineated not once, but "consistently" delineated over several, successive works.   See, e.g., Towle, 802 F.3d at 1021; X One, 644 F.3d at 600.[15]   Jurisprudence in the Second Circuit has not adopted such a "consistency" requirement.   Of course, it may take an author several underlying works before the author satisfies copyright law's fixation and originality requirements.   Once these requirements have been met, however, "[n]o more is required for a character copyright." Gaiman, 360 F.3d at 660 (collecting cases).   Such is the teaching of Feist, 499 U.S. at 352-56.[16]

_____

[15] The Eighth Circuit requires that characters that have been only graphically delineated be "depicted with consistent, distinctive visual characteristics throughout" each work, because subsequent changes to these qualities indicate that the character is not protectable.   See X One, 644 F.3d at 600 (holding that early movie posters depicting Tom and Jerry did not support character copyright protection because their visual characteristics changed over time); id. at 601-02 (holding that various colorized promotional photographs for *The Wizard of Oz* did not support copyrightability because the colors of the characters' clothing and faces changed between photographs).   The Ninth Circuit lessens this burden, requiring that the author consistently delineate only conceptual qualities—not physical qualities—over each work in which the character is depicted.   See Towle, 802 F.3d at 1021.

[16] To the extent that the Eighth and Ninth Circuits are concerned with consumer confusion or the misappropriation of the labor of another, as to which a consistent portrayal of character qualities may very well be material, such interests are more appropriately addressed via trademark law and unfair competition.   See Eva's Bridal Ltd. v. Halanick Enters., Inc., 639 F.3d 788, 790 (7th Cir. 2011) (discussing, in a trademark infringement case, the importance of consistent, predictable quality); accord Can't Stop Prods., Inc. v. Sixuvus, Ltd., No. 17-CV-6513 (CS), 2018 WL 1684413, at *9 (S.D.N.Y. Mar. 6, 2018); see also ITC, 9 N.Y.3d at 479 (to support a claim for unfair competition under New York law, the plaintiff must have actually developed, as a byproduct of its labor, goodwill in the marketplace); Rebecca Tushnet, Legal Fictions: Copyright, Fan Fiction, and A New Common Law, 17 Loy. L.A. Ent. L.J. 651, 674 (1997) ("Corporations that attack fan fiction may have confused copyright law with trademark law. These corporations mistakenly fear that failure to contest any use of their creations would weaken their claims against possible commercial appropriation.").   Where issues surrounding subsequent iterations of a character arise in copyright law, such concerns are more appropriately addressed in a derivative works analysis.   See Silverman, 870 F.2d at 49-50; accord Klinger v. Conan Doyle Estate, Ltd., 755 F.3d 496, 500-03 (7th Cir. 2014).

Finally, as noted above, the Copyright Office does not register claims of copyright for characters.  See *supra* p.14.  During litigation, those claiming to own character copyrights thus do not have the benefit of the presumption of validity that accompanies registration.  Accordingly, the plaintiff in such a copyright infringement action must allege sufficient facts regarding the character's distinctive delineation so as to plausibly support the inference that the character warrants copyright protection.  See Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co., 149 F.Supp.3d 1167, 1172-74 (N.D. Cal. 2015).

### 3. Copyrightability of the At-Issue Characters [17]

The question before this Court is whether plaintiffs have pled or proffered facts sufficient to plausibly allege that their characters were distinctively delineated.  With respect to El Borak, Solomon Kane, and Kull, this Court concludes that they have done so.

As an initial matter, the Court disregards the Complaint's assertions of originality and protectability, see, e.g., Compl. ¶ 14, which are mere legal conclusions, see Blizzard Entm't, 149 F.Supp.3d at 1174.  Setting aside the character names, see Compl. ¶ 8, which do not give rise to valid character copyrights, see Captain Blue Hen Comics, 2014 WL 2941280, at *3, [18]

---

[17] Courts typically address the issue of a character's copyrightability in connection with the wrongful-copying element as opposed to the validity element.  See generally, e.g., Nichols, 45 F.2d 119.  The Second Circuit has not addressed whether such a procedure is mandatory.  Cf. Kregos v. Associated Press, 937 F.2d 700, 705 (2d Cir. 1991) (in discussing the idea/expression merger doctrine—a doctrine similar to the scènes à faire doctrine, which heavily impacts character copyrightability—the Second Circuit opines that the better practice is to assess merger in determining whether wrongful copying has occurred, rather than whether the copyright is valid).  In light of the facial implausibility of valid copyrights for several of the at-issue characters, this Court will address copyrightability in the context of the validity element, see Blizzard Entm't, 149 F.Supp.3d at 1172-74, as well as in the context of wrongful copying, see *infra* pp.37-48.

[18] Plaintiffs concede that the delineation of a character name, even if made in the context of other general character traits, does not necessarily constitute distinctive delineation.  For example, plaintiffs take the position that, although "the Kull character was named and introduced" in an earlier public

the Complaint pleads no facts regarding plaintiffs' characters' delineation, let alone their distinctiveness.   Noting these deficiencies, the Court directed plaintiffs to supplement their submissions.   See Order to Show Cause.   Despite a now voluminous record, plaintiffs offer little analysis on copyrightability.   See Pl. Supp. Mem. at 2 (merely noting that fictional characters are considered copyrightable subject matter (i.e., works of authorship) and that courts apply the distinctively-delineated test).   But it is not the role of the Court to advocate on behalf of plaintiffs' assumption that, because copyright protection is available to characters in fictional works, their characters are protectable.   Despite this Court's best efforts, it finds plaintiffs' submissions fall short of plausibly alleging copyrightability with respect to Dark Agnes, Bran Mak Morn, Ironhand, and Conan.

Dark Agnes is not plausibly delineated or distinctive.   The only characteristics that plaintiffs identify in their supplemental submissions are that Dark Agnes has red hair, wields a sword, and wears "a doublet, trunk-hose, and Spanish boots[,]" as well as a morion.   See Malmberg Supp. Decl. Ex. 5 at 2.   All that we know of her conceptual qualities is her name, Dark Agnes, see id., though Robert Howard's words imply that she fights with her sword, see id. ("[T]he sword that [hangs] at my hip [is] not [an] ornament . . . .").

Dark Agnes' physical qualities are, for purposes of pleading, barely more than mere nominal character traits.   Conspicuously lacking, however, are those fundamental conceptual qualities that indicate the delineation of a character.   We know next to nothing of Dark Agnes' personality—her habits, passions, background, and other intricacies or quirks.   Under this

---

domain story, such delineation did not amount to a protectable character.   See Malmberg Supp. Decl. ¶ 8; see also id. ¶ 9; infra p.36.

showing, Dark Agnes is no more a character than a mannequin is a person.  See X One, 644

F.3d at 600-01.   In short, based on the characteristics cited by plaintiffs, the Court cannot

plausibly conclude that Dark Agnes is a delineated character warranting copyright protection.

Moreover, even if Howard had described and depicted further qualities so as to amount

to the delineation of a character, the few delineated qualities to which plaintiffs have directed

the Court's attention are not distinctive.   The fact that Dark Agnes wears clothing associated

with Renaissance warriors and fights with a sword describes the essence of many a

swordstress, and is analogous to a claim of copyright protection over the delineation of a

magician who wears a tuxedo and pulls a rabbit out of his hat.   See Rice, 330 F.3d at 1175.

The Court reaches a similar conclusion with respect to Bran Mak Morn.   Bran Mak

Morn is a semi-naked, lithely built, thin-lipped man of medium height, whose hair is coarse

and black, and who wears an iron crown with a single red jewel in the center.   See Malmberg

Supp. Decl. Ex. 4(1) at 2.   Conceptually, his name is Bran Mak Morn, he is a barbarian "king

of the Picts," and he fights.   See id.

With this showing, Bran Mak Morn fares no better than Dark Agnes.   The additional

delineation of Bran Mak Morn's crown and status as a king of the Picts inches closer to

supporting the plausibility of delineation.   Nevertheless, even if these qualities do support the

delineation of a barbarian king, they are not distinctive.   Aside from his uncopyrightable name

and title, nothing distinguishes Bran Mak Morn from the stock barbarian king; his crown is as

stock to his status as king as the wearing of a tuxedo is to the magician.   See Captain Blue

Hen Comics, 2014 WL 2941280, at *3; cf. Hogan v. DC Comics, 48 F.Supp.2d 298, 310

30

(S.D.N.Y. 1999) (holding that a half-vampire character named Nicholas Gaunt, who was on a quest to discover his origins, consisted of "unprotectable themes and concepts").

Plaintiffs' proffer does not plausibly support that Conan and Ironhand are protectable. Conan is a large, muscular, strong man with scars on his dark face.  See Malmberg Supp. Decl. Ex. 1(1) at 2-5.  He has blue eyes and black hair that is cut square.  See id.  He carries a great sword and wears nothing but a loincloth.  See id.  His name is "Conan, the Cimmerian," and he fights.  See id.  Ironhand likewise wears only a loincloth with a belt and sandals, and he carries a long knife in a leather sheath and wields "a long straight sword with a broad silver guard."  See Malmberg Supp. Decl. Ex. 3(1) at 2.  He is called Ironhand.[19]  See id.  He feels "no need of art, literature or intellectuality[,]" and he "clutches[s] at life like a glutton[.]"  Id. at 3.  As with Bran Mak Morn, these qualities are notable in delineating barbarians, but they are hardly distinctive.   Conan's interest in fighting and Ironhand's disdain for intellectuality and gluttonous embrace of life are the very definition of barbarians; these qualities are as stock to the barbarian as the interest in magic is to the magician.[20]

---

[19] In plaintiffs' supplemental motion papers, they assert that "Ironhand a/k/a Esau Cairn [is] from the planet Almuric . . . ."  Pl. Supp. Mem. at 5.  This quality is not proffered in plaintiffs' comparison of the works at issue.  See Malmberg Supp. Decl. Ex. 3(1) at 2-3.  Regardless, like a character's name or title, the bare name of a character's place of origin, with no delineation of the character in an original landscape, does little to support distinctive delineation.  Cf. Hogan, 48 F.Supp.2d at 310; Gal v. Viacom Int'l, Inc., 518 F.Supp.2d 526, 547 (S.D.N.Y. 2007); see also Walker, 784 F.2d at 50 (New York City police officers set in the 41st Precinct in South Bronx not copyrightable).

[20] It is also noteworthy that several of Howard's characters share qualities with one another, including nearly naked men who wield weapons and have large muscles.  Indeed, some of the characters' literal delineation appears to be lifted verbatim from other of the at-issue characters, drawing into question whether the character qualities were independently created.  For example, in 1930, Robert Howard delineated Kull as having a "square-cut, lion-like main [sic] of hair" that was black, see Malmberg Supp Aff. Ex. 2 at 2, and, in 1933, delineated Conan as having a "square-cut black mane" of hair, see Malmberg Supp. Decl. Ex. 1(1) at 2.

To be sure, plaintiffs may now complain that these deficiencies were the result of in-artful pleading and that plaintiffs should be granted leave to amend.   However, by virtue of this Court's Order to Show Cause, plaintiffs have had ample opportunity to proffer evidentiary facts to support their conclusory claim of delineation, and their submissions have failed to make the requisite showing as to the above at-issue characters.[21]

El Borak, Solomon Kane, and Kull stand on a different footing.   In plaintiffs' proffered materials, El Borak is described as an American who is dressed like an Englishman, wielding a revolver, and having a "steely frame" with a "brown, muscular chest[.]"   See Malmberg Supp. Decl. Ex. 6(1) at 2-3.   Conceptually, he is "quick with a gun."   See id. at 2.   Robert Howard also noted that he is associated with the Middle East.   See id.   His real name is Gordon, but "Afghans call him 'El Borak,'" which means "the Swift."   See id.   Further, he wears "an Arab headdress" and wields a "Turkoman scimitar."   See id.

Solomon Kane is described by Howard as a man who wears leather boots, a "featherless slouch hat[,]" and wields a musket.   See Malmberg Supp. Decl. Ex. 7(1) at 2-3. His name is Solomon Kane and he fights.   See id.   In addition, Solomon Kane is associated with a special staff: a "cat-headed ju-ju staff."   See id.

---

[21] The Court is not suggesting that plaintiffs lack valid copyrights in the literary and pictorial works that portray these apparently stock characters.   Although stock material may itself be unoriginal, an author's particular, literal expression of such material may be protected under copyright.   See Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133, 134 (2d Cir. 2004); see also Walker, 784 F.2d at 48-52.   However, plaintiffs here do not assert that defendant's figurines are substantially similar to plaintiffs' pulp fiction stories or drawings so as to infringe the copyrights in their literary or pictorial works.   Rather, plaintiffs assert that defendant's figurines infringe character copyrights.   Because, as to the aforementioned characters, plaintiffs have pled facts and proffered evidence reflecting mere stock characters, they have failed to adequately plead valid copyrights in those characters.

Finally, Kull is described as being "built like the Vikings," with a "square-cut, lion-like main [sic] of [black] hair[.]"   See Malmberg Supp. Decl. Ex. 2 at 2.   He wears sandals, a broad belt with a golden buckle, and a "head-band of hard gold[.]"   See id.   Kull wields a "great shield" on "his left arm."   See id.   Conceptually, his name is Kull, he is from Atlantis, he is the "king of Valusia[,]" and he fights.   See id.   Moreover, Kull is associated with tigers. Robert Howard described Kull as "at once massive and lithe -- tigerish," a description reinforced in later depictions of Kull alongside tiger images.   See id. at 3, 4.

These qualities plausibly suggest that, with respect to El Borak, Solomon Kane, and Kull, Robert Howard delineated some sort of characters with distinctive qualities: an American gunslinger associated with the Middle East (El Borak), a Puritanical do-gooder with a magical cat-headed staff (Solomon Kane), and a Viking-like warrior-king associated with tigers (Kull). Cf. Detective Comics, 111 F.2d at 433 (holding that "pictorial and verbal descriptions of 'Superman' are not a mere delineation of a benevolent Hercules").   Further, nothing suggests that Howard copied these qualities from some preexisting source.   Compare with Durham, 630 F.2d at 910 ("[T]he mere reproduction of Disney characters in plastic, even though the adaptation of the preexisting works to this medium undoubtedly involved some degree of manufacturing skill, does not constitute originality . . . .").

A character's association with the Middle East, a cat-headed staff, and tigers are admittedly quite minimal in terms of creativity.   Nevertheless, no more is required of an author, particularly at the pleading stage.   See Gaiman, 360 F.3d at 660.   Where, as here, the question is whether there is more than a mere possibility, as opposed to a likelihood, of

33

copyrightability, the Court concludes that it is just plausible that El Borak, Solomon Kane, and Kull—main characters in Robert Howard's stories—were distinctively delineated.

### 4. *Duration of Copyright*

For the characters that gained copyright protection, those copyrights were still plausibly valid at the time of defendant's purported infringement.   Plaintiffs allege that, in the 1930s, Robert Howard wrote stories that portrayed the characters.   See Compl. ¶ 8.   The earliest character copyright that plaintiffs assert is over Solomon Kane, who was first sufficiently delineated in "The Hills of the Dead," which was initially published on July 1, 1930, as compiled in the Weird Tales periodical volume 16, number 2.   See Malmberg Supp Aff. Ex. 7(1) at 2, 6; Compl. ¶¶ 8, 11.   The copyright in this story was subsequently registered in December 1930, see Malmberg Supp. Decl. Ex. 7(1) at 6, and timely renewed in 1958, see id. at 7; 17 U.S.C. §§ 23-24 (1909) (providing that copyright "shall endure for twenty-eight years from the date of first publication" and may be renewed in its final year); see also *infra* pp.49-50 (noting that, for purposes of registration requirements, character copyrights are linked with the registration of their initial underlying work).   The renewal term under the 1909 Act extended this copyright protection by 28 years until 1986.   See 17 U.S.C. § 23 (1909).   On January 1, 1978, the effective date of the original 1976 Act, this term was statutorily extended by 19 years until 2005.   See Stewart v. Abend, 495 U.S. 207, 224 (1990).   Per the allegations in the Complaint, all statutory formalities were complied with such that, by March 1, 1989, the copyright had not been divestively published (for example, by distribution to the general public without proper notice).   See Compl. ¶ 13; 17 U.S.C. § 405(a) (1976); Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 633

n.14 (2d Cir. 2004).   Then, on October 27, 1998, the effective date of the Sonny Bono

Copyright Term Protection Act, the renewal term was again, and finally, statutorily extended

by 20 years (for a total of 95 years from the date the copyright was first secured) until 2025.

See 17 U.S.C. § 304(b); Baldwin v. EMI Feist Catalog, Inc., 805 F.3d 18, 23 (2d Cir. 2015).

Thus, even the oldest copyright that plaintiffs charge defendant with infringing was plausibly

still in effect—albeit in its final few years—at the time of defendant's purported infringement in

2016.

    Once again, this conclusion is a product of the procedural posture of the case—that is,

an uncontested motion for default judgment and thus a review of plaintiffs' allegations for

plausibility.   Had defendant opted to defend this case, he may well have successfully

challenged the continued validity of plaintiffs' character copyrights at the time of purported

infringement.   In a copyright infringement action brought by CPI, one of the plaintiffs herein,

in the Southern District of New York, the court held that "the Conan of Robert Howard

resides in the public domain" because the copyrights in numerous of the early Conan stories

were not timely renewed.   See Conan Props., Inc. v. Mattel, Inc., 712 F.Supp. 353, 358

(S.D.N.Y. 1989).   The court concluded that, to the extent CPI owned copyrights in comic

books that incorporate Conan, its character copyrights were limited to the additionally

delineated original physical qualities depicted in the subsequent comic books; despite a

developed record, the court struggled to define those additionally delineated qualities,

concluding that "whatever the exact scope of CPI's rights, CPI fails to raise a question of fact

concerning their infringement."   See id. at 358-60 & nn.9-10.[22]

---

[22] The District Court in this case would be justified in dismissing on this additional basis—or at least

35

Similarly, plaintiffs concede that the copyrights to earlier stories portraying Kull and Solomon Kane had entered the public domain.   <u>See</u> Pl. Supp. Mem. at 5 n.4.   Seeking to avoid the loss of protection for Kull and Solomon Kane, plaintiffs argue that the two characters had not been sufficiently delineated in those earlier stories and that therefore, copyright protection had not yet commenced when the underlying works entered the public domain; plaintiffs contend that they do own the copyrights in subsequent stories that "are the first works in which those characters' distinctive and original elements appeared . . . ."   <u>See id.</u>   Under these facts, had he not defaulted, defendant may very well have succeeded in proving that, to the extent Kull and Solomon Kane ever acquired copyright protection, they have since entered the public domain.   This Court will nevertheless assume that REHP's copyrights were plausibly still in effect at the time of defendant's alleged infringement.

## C.  <u>Actual Copying</u>

To support copyright infringement, a plaintiff must show that the defendant actually copied from its work.   <u>See</u> Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122 (2d Cir. 1994), <u>abrogated on other grounds by</u> Salinger, 607 F.3d at 77.   In other words, it is not enough for there to be similarities between the works.   <u>See id.</u> at 123.   Such similarities must be the product of the defendant actually copying the material from the plaintiff's work.   <u>See id.</u>; Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95, 100-02 (2d

---

significantly limiting—CPI's current copyright infringement claim with respect to Conan.   <u>See</u> Shaw Family Archives Ltd. v. CMG Worldwide, Inc., No. 05 Civ. 3939(CM), 2008 WL 4127830, at *18 (S.D.N.Y. Sept. 2, 2008) (collecting Second Circuit cases for the proposition that "a court may dismiss the action <i>sua sponte</i>" on the ground of nonmutual offensive collateral estoppel).   But even if plaintiffs did own valid character copyrights in Conan at the time of defendant's purported infringement, plaintiffs' copyright infringement claim fails because plaintiffs have not plausibly alleged that defendant wrongfully copied from the Conan character.   <u>See</u> <i>infra</i> pp.44-46.

Cir. 2014) (coincidental similarities that are the product of a defendant's independent creation do not support copyright infringement).   Absent facts from a witness to, or the defendant's admission of, the defendant's copying in fact from the plaintiff's work, actual copying must be supported with facts showing (1) the defendant's access to the plaintiff's work and (2) some intrinsic indication in the defendant's work to reasonably support the inference that the defendant copied material from the plaintiff's work (referred to as "probative similarity"). See Zalewski, 754 F.3d at 101; Fisher-Price, 25 F.3d at 123.

Here, plaintiffs have adequately pled facts supporting both access and probative similarity.   Plaintiffs attach to their Complaint excerpts from defendant's Kickstarter campaign in which defendant noted that his figurines were made in homage to the kinds of characters he imagines in reading Robert Howard's stories.   See Compl. Ex. A at 3, 8.   Although not a full admission of actual copying, this supports defendant's access to the at-issue characters. Moreover, defendant affixed plaintiffs' characters' names to images of his figurines, see Compl. ¶ 24, thus supporting a "probative degree of similarity" between the works.   These similarities, together with defendant's access, plausibly support that, in creating his figurines, defendant actually copied material from plaintiffs' characters.

**D.  Wrongful Copying**

*1.  Governing Law*

In addition to showing actually copying, a plaintiff in a copyright infringement action must establish that that copying was unlawful, in that the defendant copied a material degree of protected expression from the plaintiff's work.   See Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir. 2003); Patry § 9:59 (discussing both

37

components).   In order to be "protected," the copied expression must be "fixed" and

"original," as discussed above in connection with the validity element of copyright

infringement.   An appropriation of such expression is said to be "material" if there is enough

of a similarity with the plaintiff's work (referred to as "substantial similarity") such that a lay

spectator would view the defendant's work as having appropriated something of value

belonging to the plaintiff.   See, e.g., Arnstein v. Porter, 154 F.2d 464, 473 (2d Cir. 1946)

(establishing that materiality is determined from the view of a lay spectator, not experts).   Put

differently, if the defendant's actual copying is either qualitatively or quantitatively de minimis,

the copying would not, as a matter of law, amount to wrongful copying.   See Ringgold v.

Black Entm't Television, Inc., 126 F.3d 70, 74-77 (2d Cir. 1997); compare id. at 77

(concluding that copying passed de minimis threshold), with Gottlieb Dev. LLC v. Paramount

Pictures Corp., 590 F.Supp.2d 625, 632-34 (S.D.N.Y. 2008) (holding that copying did not

pass de minimis threshold), and Newton v. Diamond, 388 F.3d 1189, 1192-97 (9th Cir. 2004)

(same); see also Patry § 9:64 (discussing origin of this principle).

Accordingly, substantial similarity is lacking where the similarities, if any, between the

works reside only in unprotected material—that is, where the defendant did not appropriate any

protected expression that was original to the allegedly infringed work.   See Feist, 499 U.S.

at 361-64 (holding that the defendant did not illegally copy from the plaintiff's work because

there was no similarity in expression that was original to the copyright holder); Peter F. Gaito

Architecture, 602 F.3d at 63-69 (affirming dismissal of copyright claim where plaintiffs at

most alleged the copying of ideas and concepts, not protectable elements of plaintiffs'

architectural design).   Or, as Judge Hand put it,

38

> If Twelfth Night were copyrighted, it is quite possible that a second comer
> might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would
> not be enough that for one of [the second comer's] characters he cast a riotous
> knight who kept wassail to the discomfort of the household, or a vain and
> foppish steward who became amorous of his mistress. These would be no more
> than Shakespeare's "ideas" in the play, as little capable of monopoly as
> Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species.

Nichols, 45 F.2d at 121.

Where there is at least some similarity in protected expression, courts in the Second Circuit apply a variety of tests to determine whether such similarity is substantial, the selection of which depends on the scope of the copyright's protection,[23] the categories of the works in dispute, and the nature of copying at issue.   See Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 138-42 (2d Cir. 1998) (discussing various substantial similarity tests); Altai, 982 F.2d at 706-12 (engaging in an abstraction-filtration-comparison test for computer programs).   In "most cases," the Second Circuit employs the "ordinary observer" test, which seeks to determine whether the lay spectator, "unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same."   Laureyssens v. Idea Grp., Inc., 964 F.2d 131, 141 (2d Cir. 1992) (quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960)). This test is particularly useful where the plaintiff's copyright is "thick" and the similarities

---

[23] The scope of a copyright's protection in turn depends upon the degree of originality reflected in the copyrighted work.   See Feist, 499 U.S. at 349.   If the work exhibits relatively little originality, the copyright in such a work is said to be "thin."   See id.   Thus, the "thickness" of a character copyright depends upon how distinctly the author delineated the character.   See Nichols, 45 F.2d at 121 ("It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").

reside in large portions of the plaintiff's literal elements of protected expression.   See Nimmer § 13.03[A][1] (referring to such similarities as "comprehensive literal similarities").

Where the plaintiff's copyright is thin, such that the work exhibits relatively little original expression (i.e., where the work features much public domain material), courts in the Second Circuit employ a "more discerning observer" test.   See Boisson v. Banian, Ltd, 273 F.3d 262, 271-73 (2d Cir. 2001) (discussing Folio Impressions, Inc. v. Byer Calif., 937 F.2d 759, 763 (2d Cir. 1991)).   This test is particularly useful where the similarities in protected expression reside only in higher levels of abstraction, such as in the arrangement of unprotected material.   See id.; Nimmer § 13.03[A][1] (referring to such similarities as "comprehensive non-literal similarities").   Given the significance of stock characters and the frequently sparse, abstract expression added to them, courts use the "more discerning observer" test in the context of character copyright infringement.   See, e.g., Warner Bros., 720 F.2d at 239-45 (applying what is now referred to as the "more discerning observer" test).

The Second Circuit described the application of this test in its decision in Boisson, 273 F.3d at 272-73, which the Court subsequently summarized as follows:

> Where, as here, the plaintiff's work incorporates significant elements from the public domain, the ordinary observer test becomes "more discerning" because a "'more refined analysis' is required where a plaintiff's work is not 'wholly original.'" The plaintiff must allege "substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation." Courts must compare "the 'total concept and feel' of the contested works" rather than "dissect the works at issue into separate components and compare only the copyrightable elements."

McDonald v. West, 669 F.App'x 59, 60 (2d Cir. 2016) (quoting Boisson, 273 F.3d at 273; other citations omitted).   Or, as William Patry puts it, the total-concept-and-feel principle

"requires the ordinary observer to focus on the forest, not the trees. Where the parties' works contain a significant amount of public domain material, the [Second Circuit] has used the 'more-discerning-observer' test, which requires that in using a total-concept-and-feel approach, public domain trees be left out of the forest."  Patry § 9:137.

In pleading wrongful copying, a plaintiff need only allege sufficient, non-conclusory facts describing or depicting the similarities between the defendant's work and the protectable elements of the plaintiff's so as to show that there is more than a mere possibility that a lay spectator would find the two works to be substantially similar.  See Adams v. Warner Bros. Pictures, 289 F.App'x 456, 457 (2d Cir. 2008) ("The complaint also contains no allegations describing the similarities between Adams's and defendants' works, and, like the district court, we conclude, as a matter of law, that no substantial similarities would be identified by a 'lay observer.'"); Lambertini v. Fain, No. 12-CIV-3964 (DRH)(ARL), 2014 WL 4659266, at *2, *4 (E.D.N.Y. Sept. 17, 2014).   Absent such allegations, a court may dismiss the copyright infringement claim.  See Peter F. Gaito Architecture, 602 F.3d at 59, 69 (upholding dismissal of amended complaint for "fail[ing] to adequately allege substantial similarity between defendants' work and the protectable elements of plaintiffs'"); Adams, 289 F.App'x at 457 (affirming dismissal where copyright claim "failed to plead facts sufficient to determine the copying element"); Lambertini, 2014 WL 4659266, at *4 (dismissing copyright complaint as "devoid of any allegations as to which elements of Plaintiff's works were protected. While Plaintiff correctly argues that she is not required to prove her claim at the pleading stage . . . , she nevertheless has the burden of properly alleging her claim, which includes, *inter alia,*

alleging that Defendant copied her work, and identifying with some degree of specificity how Defendant's works are substantially similar to her own.").

### 2. *Plaintiffs' Allegations of Wrongful Copying*

Here, even assuming that all seven at-issue characters are protectable,[24] the delineated qualities to which plaintiffs have directed the Court's attention largely fail to plausibly support defendant's wrongful copying.   As an initial matter, plaintiffs' conclusory allegations as to the existence of a substantial similarity between the works, see Compl. ¶ 30, must be disregarded on this motion as merely tracking the language of one element of copyright infringement.

Apart from this perfunctory assertion, the only facts alleged in the Complaint regarding defendant's copying concern the names of the at-issue characters.   See id. ¶¶ 8, 24.   Although this copying serves as a proper foundation from which to allege a "probative similarity" regarding defendant's "actual copying," it is not sufficient to support a plausible allegation of a "substantial similarity" regarding his "wrongful copying."   See Zalewski, 754 F.3d at 100-01; Gal, 518 F.Supp.2d at 547 ("[C]ourts have not placed a great deal of emphasis on similarities in character names." (collecting cases)).   In other words, probative similarity may be founded upon the appropriation of unprotectable material—particularly where, as with plaintiffs' character names, such material is peculiarly associated with a plaintiff's work—because probative similarity asks whether some aspect of the defendant's work reasonably supports the inference that the defendant actually copied material from the plaintiff's work.   See Zalewski,

---

[24] Despite this Court's conclusion that plaintiffs have plausibly delineated only three copyrightable characters, see *supra* pp.28-34, the discussion that follows assumes that plaintiffs have valid copyrights in all seven at-issue characters, and addresses the purported wrongful copying of each, see *supra* p.28 n.17.

754 F.3d at 101; 3 Patry § 9:19.   By contrast, substantial similarity may not be founded upon such material because the wrongful-copying inquiry asks whether the similarities between the works support the kind of copying with which the law concerns itself, i.e., whether the defendant appropriated a *material* degree of *protected* expression.   See, e.g., Feist, 499 U.S. at 344, 361-63 (noting that defendant's actual copying did not support unlawful copying because there were no similarities in *protected* expression); 3 Patry § 9:16 (discussing distinction between actual and wrongful copying).[25]

Noting these deficiencies in plaintiffs' Complaint, this Court directed plaintiffs to supplement their submissions with a comparison of the works so as to support the plausibility of substantial similarity.   See Order To Show Cause at 2-3.   In response, plaintiffs submitted "side-by-side comparisons" that purport to demonstrate that defendant copied what plaintiffs assert, without analysis, are "distinctive elements" of the at-issue characters.   See Pl. Supp. Mem. at 4.   Nevertheless, regarding Dark Agnes, Bran Mak Morn, Ironhand, and Conan, plaintiffs' supplemental submissions indicate that, to the extent there are similarities between the parties' works, they reside only in unprotected material.   Aside from character names and titles—which do not, without more, support substantial similarity—the only similarities to which plaintiffs have directed the Court's attention concern components that are, for all

---

[25] Plaintiffs necessarily concede that the similarity in character names—even if probative of a defendant's copying—does not constitute the material copying of *protected* expression.   See *supra* pp.28-29 n.18.

Nevertheless, although defendant's use of similar character names and titles (Dark Agnes / Swordswoman; Bran Mak Morn / The Pict; Almuric / Ironhand; Conan / The Barbarian; El Borak / The Adventurer; Solomon Kane / The Puritan; and Kull / The Atlantean) may not fully support a copyright infringement claim, it may support a trademark infringement claim.   See *infra* pp.50-60; see also *supra* p.27 n.16.

practical purposes, necessary and standard to draw in an observer's mind the kinds of characters that are depicted—scènes à faire material that is unoriginal to Robert Howard.   <u>See</u> <u>Feist</u>, 499 U.S. at 345 ("[C]opyright protection may extend only to those components of a work that are original to the author.").

Defendant's figurine titled Dark Agnes depicts a woman with medium-length, flowing hair, wearing a corset, large boots, and large gloves, and wielding a sword.   <u>See</u> Malmberg Supp. Decl. Ex. 5 at 3.   Apart from the name, the only similarity with REHP's character is that both are women wearing somewhat similar Renaissance-warrior clothing and wielding swords.   These are not similarities in protected expression, but, rather, in stock qualities of swordstresses.

Likewise, defendant's figurine titled Bran Mak Morn depicts an extremely muscular man wearing nothing but a loincloth.   <u>See</u> Malmberg Supp. Decl. Ex. 4(1) at 2.   His hair is braided, and he is wielding an ax in his right hand and a spear in his left.   <u>See id.</u>   The only similarities with REHP's Bran Mak Morn character are that both are nearly nude barbarians with coarse hair.   It is unclear whether defendant's figurine is wearing some sort of crown. <u>See id.</u>   Even if it does, these similarities do not reside in protected expression; they are similarities in stock qualities of barbarian kings.   <u>Cf.</u> <u>Hogan</u>, 48 F.Supp.2d at 310-13 (no substantial similarity between comic book and graphic novel despite the fact that the two works both "centered around a half-human, half-vampire character named Nicholas Gaunt," a white male in his early twenties, "with pale skin, dark messy hair and a slovenly appearance").

The parties' respective portrayals of Ironhand and Conan yield a similar analysis and conclusion.   The parties' Ironhand characters are both nearly nude, muscular men who wield

swords and have strong fists.   See Malmberg Supp Aff. Ex. 3(1) at 2.   The parties' Conan

characters are both large, nearly nude, muscular men with bangs, who wear loincloths and

wield swords.   See Malmberg Supp. Decl. Ex. 1(1) at 2.   To the extent plaintiffs' Ironhand

and Conan have any distinctive qualities, defendant only copied stock barbarian material from

which they were built: very strong, uncivilized, nearly nude men who fight.

Plaintiffs do present the Court with a figurine created by defendant that is a virtually

identical three-dimensional rendering of a two-dimensional pictorial work that plaintiffs claim

is the cover art for a Conan comic book.   See id. at 3.   Assuming the latter artwork is

protected, then this plausibly amounts to wrongful copying of the *cover artwork*.

Nevertheless, plaintiffs concede that they do not own the copyright in this artwork.   See Pl.

Supp. Mem at 4 n.3.   Instead, plaintiffs assert that this artwork is a derivative work—a

pictorial work that incorporates the preexisting, protected Conan character—and that the virtual

identity between defendant's Conan figurine and this artwork constitutes wrongful copying of

CPI's Conan.   See id.   This argument suffers from the same deficiency noted above: Plaintiffs

have pointed to nothing suggesting that defendant copied any character expression original to

Robert Howard's or CPI's Conan.[26]

Put differently, although defendant may have actually copied material from these

characters, he copied no more than Robert Howard's ideas.   See Nichols, 45 F.2d at 121-22

---

[26] Plaintiffs cite cases that purportedly stand for the proposition that a virtually identical copy of a derivative work indicates the wrongful copying of the source material.   See Pl. Supp. Mem at 4 n.3. These cases presuppose, however, that the virtually identical material incorporates some protected expression from the source material, which plaintiffs have failed to plausibly show here.   In other words, aside from conclusory assertions, plaintiffs have not plausibly shown that this cover artwork is a derivative work that incorporates CPI's protected character expression.

(holding that, even if the plaintiff independently created her characters, the "defendant has not taken from her more than their prototypes have contained for many decades"); Silberstein v. John Does 1-10, 242 F.App'x 720, 722 & n.1 (2d Cir. 2007) (assuming ownership of valid copyrights but holding that any similarities between characters fell "within the *scènes à faire* doctrine"); Mattel, Inc. v. Azrak–Hamway Int'l, Inc., 724 F.2d 357, 360 (2d Cir. 1983) (per curiam) (holding that defendant's action figure did not infringe plaintiff's because the similarities between the works were of unprotected ideas: superhuman musclemen crouching in traditional fighting pose); see generally Williams v. Crichton, 84 F.3d 581, 587-89 (2d Cir. 1996) (the similarities between the two works—children's books about a dinosaur zoo and the novel and film *Jurassic Park*—arise from noncopyrightable elements); Warner Bros., 720 F.2d at 239-45 (holding that, despite defendant's work's reference to plaintiff's Superman character, no reasonable juror could find the characters to be substantially similar).   Far from being wrongful, such copying is the kind that copyright law encourages.   See Feist, 499 U.S. at 361 ("Not all copying, however, is copyright infringement."); Gaiman, 360 F.3d at 660 ("[O]ther authors can use the stock character out of which [the distinctive character] may have been built without fear (well, without too much fear) of being accused as infringers.").

Defendant's copying from El Borak, Solomon Kane, and Kull does, however, plausibly amount to wrongful copying.   Part of what makes REHP's El Borak distinctive as an American gunslinger is his association with the Middle East: He has a muscular chest, dresses like an Englishman in dusty boots and breeches, wears an "Arab headdress," and wields a gun and scimitar.   In defendant's figurine titled EL BORAK, he depicts a very muscular, shirtless man, wearing pants and boots, and wielding a gun in his right hand and a scimitar in his left.

46

See Malmberg Supp Aff. Ex. 6(1) at 2.   Moreover, he is covering part of his head with a Middle Eastern headscarf.   See id.

Similarly, REHP's Solomon Kane is a man who wears boots and a featherless slouch hat.   He wields a musket and a "cat-head ju-ju staff," which is part of what makes Solomon Kane distinctive.   Defendant's figurine titled THE PURITAN, which was changed from SOLOMON KANE after plaintiffs' takedown notice, depicts a man wearing boots, a hat with no feathers, carrying two muskets in his belt, and holding a staff over his left shoulder.   See Compl. Ex. G at 5; Malmberg Supp Aff. Ex. 7(1) at 2; Compl. ¶ 28.   The top of this staff depicts the head of a cat.   See Compl. Ex. G at 5; Malmberg Supp. Decl. Ex. 7(1) at 2.

REHP's Kull is a lithe, semi-nude, Atlantean, barbarian king who wears sandals, a golden headband, and a belt with a golden buckle.   Kull fights with a shield on his left arm. Kull's distinctive quality is his association with tigers.   Defendant's figurine titled KULL THE ATLANTEAN depicts a nearly nude, muscular man wearing sandals, a crown, and a belt with a buckle.   See Compl. Ex. F at 2.   This man is wielding an ax in his right hand and, on his left arm, a shield depicting the head of a tiger.   See id.

The appropriation of an American gunslinger, a man dressed in Renaissance clothing, and a warrior king does not, without more, constitute wrongful copying.   Nevertheless, the appropriation of certain characteristics—a Middle Eastern headscarf and scimitar in connection with one figurine, a cat-headed staff in connection with another, and a tiger in connection with a third—in relation to the total concept of Robert Howard's characters, may reasonably support a finding of substantial similarity.   Whether these minimal appropriations—together with any

47

contributions by defendant that differentiate his figurines from the at-issue characters[27]—would ultimately result in a finding of substantial similarity is not the issue now before this Court.   In the current posture of the case, the inquiry is whether there is a plausibility of a substantial similarity.   Here, there is more than a mere possibility that a lay observer would find that defendant's figurines capture the total concept of El Borak, Solomon Kane, and Kull.   Thus, plaintiffs have adequately alleged the wrongful copying of those three characters.

### E.  Exploitation of an Exclusive Right

In order to sustain a claim of copyright infringement, the defendant must also have used its substantially similar work in an unlawful fashion, that is, to exploit any of the copyright owner's five exclusive rights set forth in section 106 of the Copyright Act, including the right to reproduce copies of the copyrighted work.   See Arista Records, 604 F.3d at 117 (internal quotation marks omitted); see 17 U.S.C. § 106(1); see id. § 101 (defining "copies").   A person exploits that right by fixing the product of his actual and wrongful copying of the plaintiff's work in a material object.   See Capitol Records, LLC v. ReDigi Inc., 934 F.Supp.2d 640, 648-49 (S.D.N.Y. 2013) (citing Matthew Bender, 158 F.3d at 703). Plaintiffs allege that defendant created figurines that portray various characters, see Compl. ¶ 21, three of which, as discussed above, are, for purposes of this motion, the product of defendant's actual and wrongful copying from REHP's copyrighted characters El Borak, Solomon Kane, and Kull.   Thus, plaintiffs plausibly allege that defendant exploited REHP's reproduction rights.

---

[27] For example, Robert Howard delineated Kull as lithe, meaning slender and graceful.   Defendant's figurine, on the other hand, portrays Kull with very large muscles and in a stiff pose.

### F.  Registration Precondition

As noted earlier, prior to filing a claim of copyright infringement, a plaintiff ordinarily must register or preregister its copyright claim with the Copyright Office.  See 17 U.S.C. § 411(a) (providing various exceptions and limitations).  Although failure to comply with this registration precondition does not deprive a court of subject matter jurisdiction, see Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 166 (2010), courts in the Second Circuit nevertheless treat this as a failure to satisfy an element of copyright infringement, see DRL Software Sols., 2018 WL 1276856, at *1; K-Beech, 2011 WL 4401933, at *1-2.

In the Second Circuit, where the owner of a copyright for a collective work also owns the copyright for a constituent part of that work, registration of the collective work will, for purposes of satisfying section 411's registration precondition, extend to the constituent part. See Elsevier B.V. v. UnitedHealth Grp., Inc., 784 F.Supp.2d 286, 294-95 (S.D.N.Y. 2011) (citing Morris v. Bus. Concepts, Inc., 283 F.3d 502 (2d Cir. 2002)); Greenwich Film Prods., S.A. v. DRG Records, Inc., 833 F.Supp. 248, 250-52 (S.D.N.Y. 1993) (registration of motion picture encompassed musical compositions on its soundtrack).  Thus, where a plaintiff has registered a work (such as a periodical that features a pulp fiction magazine story), but has not separately registered the copyright in that work's constituent part (such as a character in that story), and seeks to enforce that constituent part's copyright, the plaintiff must show that the owner of the collective work was, at the time of registration, the owner of a valid copyright in the constituent part.  See E. Am. Trio Prod., Inc. v. Tang Elec. Corp., 97 F.Supp.2d 395, 416-18 (S.D.N.Y.), voluntarily dismissed, 243 F.3d 559 (Fed. Cir. 2000).

Here, plaintiffs have alleged, and have submitted Copyright Office ledgers supporting, that the copyrights in the literary works that first portrayed the at-issue characters were registered and renewed by third parties.   See generally Compl. Ex. B, Ex. D; see, e.g., Malmberg Supp Aff. Ex. 1(1) at 13-15.   Presumably because the Copyright Office does not register claims of copyright in characters, see *supra* p.14, plaintiffs have not separately registered or even attempted to register their purported copyrights in the characters themselves. Accordingly, the dispositive question here is whether plaintiffs have plausibly shown that the creation of the underlying works extended copyright protection to the characters portrayed in those underlying works.   As discussed above, plaintiffs established that three of the at-issue characters were plausibly protected under copyright.   Thus, plaintiffs have plausibly alleged the registration precondition only with respect to REHP's purported copyrights in El Borak, Solomon Kane, and Kull.

### G. Conclusion

Given plaintiffs' implausible assertions of valid copyrights and wrongful copying in connection with four of the at-issue characters, this Court recommends that the District Court enter default judgment against defendant only for the infringement of REHP's copyrights in El Borak, Solomon Kane, and Kull.

## II.   Plaintiffs' Claim For Unfair Competition Under the Lanham Act

Plaintiffs additionally assert a claim for unfair competition under Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), see Compl. ¶¶ 41-49; Pl. Mem. at 6-8; Pl. Supp. Mem. at 6-7, which proscribes, in relevant part, false designation of origin or "product infringement."   See Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.,

926 F.2d 134, 139 (2d Cir. 1991).   Specifically, Section 43 prohibits the use in commerce of

"any word, term, name symbol, or device, . . . or any false designation of origin," that "is

likely to cause confusion . . . as to the origin, sponsorship, or approval" of goods or services.

15 U.S.C. § 1125(a)(1).   This provision protects both registered and qualifying unregistered

trademarks   See J.T. Colby & Co. v. Apple Inc., 586 F.App'x 8, 9 (2d Cir. 2014).   To

prevail on such a claim, a plaintiff must prove "(1) that it owns a 'protectable trademark' and

(2) that the defendant's mark 'is likely to confuse consumers as to the source or sponsorship of

[the plaintiff's] product.'"   Id. (citation omitted); see Louis Vuitton Malletier v. Dooney &

Bourke, Inc., 454 F.3d 108, 115 (2d Cir. 2006).

Here, plaintiffs plausibly allege a claim for false designation of origin.   The Complaint

alleges that defendant used the marks CONAN, KULL, BRAN MAK MORN, ALMURIC,

DARK AGNES, EL BORAK, and SOLOMON KANE on Kickstarter.com to advertise his

figurines.   See Compl. ¶¶ 23-24; see generally Compl. Ex. F; Jae Enters., Inc. v. Oxgord

Inc., CIVIL ACTION NO. 5:15-CV-228-dTBR, 2016 WL 319877, at *4–5 (W.D. Ky. Jan.

25, 2016) (offering to sell goods on Amazon.com, with the mark displayed on the details page,

establishes the "use in commerce" and "in connection with" elements); accord Planned

Parenthood Fed'n of Am., Inc. v. Bucci, No. 97 Civ. 0629 (KMW), 1997 WL 133313, at *3

(S.D.N.Y. Mar. 24, 1997) (discussing use on the internet generally), aff'd, 152 F.3d 920 (2d

Cir. 1998).   The Complaint also avers that defendant's figurines are not in fact affiliated with

plaintiffs.   See Compl. ¶¶ 24, 27-28, 31.   The Court therefore turns to the Circuit's two-

prong test, to see whether the plaintiffs own protectable marks, and whether the defendant's

use is likely to cause consumer confusion.   See Louis Vuitton Malletier, 454 F.3d at 115l;

Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co., 630 F.Supp.2d 255, 260 (E.D.N.Y. 2008).

### A.  Ownership of Protectable Marks

Plaintiffs erroneously contend that they own registered trademarks for all seven of the at-issue character names.  See Pl. Mem. at 6 n.3; Pl. Supp. Mem. at 6.   The marks CONAN, KULL, DARK AGNES, EL BORAK, and SOLOMON KANE have been registered with the USPTO, see generally Compl. Ex. E, which presumptively establishes plaintiffs' ownership of protectable marks, see 15 U.S.C. § 1115(a).[28]   In contrast, plaintiffs have not alleged that they registered the marks BRAN MAK MORN and ALMURIC with the USPTO.[29]   Although plaintiffs plead that REHP registered those marks with the World Intellectual Property Organization ("WIPO"), see Compl. Ex. E at 6; see also Malmberg Supp. Decl. Ex. 4(1) at 7; id. Ex. 3(1) at 3,[30] they do not allege that the USPTO issued a certificate of extension of protection so as to give effect to the WIPO registration, see 15 U.S.C. §§ 1141e(a), 1141h,

---

[28] Registration with the USPTO "is prima facie evidence of a registrant's right to use the mark, and the validity of a registered mark becomes incontestable after five consecutive years of registration[.]" Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 393 n.6 (2d Cir. 1995); see 15 U.S.C. §§ 1115, 1065.

[29] Indeed, the USPTO online database notes that, although those marks were once registered, their registrations have since been abandoned in the U.S.  See USPTO, TSDR Case Viewer ("TSDR"), Case ID 78807196, 78807195, 78807193 76636445, 73365683, 78807218, 78807216, and 78807215, Status, USPTO.GOV (last visited on June 8, 2018), http://tsdr.uspto.gov.

[30] The WIPO registrations designate only Sweden as a Contracting Party.  See WIPO, Numbers – Registration: 912577 and 912578, BRAN MAK MORN and ALMURIC (last visited on June 8, 2018), http://www.wipo.int/branddb/en/ (Contracting State: SE); see also Farrelly v. Polarclad, Inc., No. 11-CV-04268-PSG, 2011 WL 5864080, at *2-3 (N.D. Cal. Nov. 22, 2011) (noting that designation of country in a WIPO registration is a prerequisite to gaining protection under the law of that country).

1141i; see also 3 McCarthy on Trademarks and Unfair Competition § 19:31.60 (5th ed. 2018) (describing protocol for using international registration to gain domestic protection).

Without the presumption of ownership that accompanies registration, the standard test for ownership of a mark is priority of use in U.S. commerce.   See Threeline Imports, Inc. v. Vernikov, 239 F.Supp.3d 542, 557-58 (E.D.N.Y. 2017) (collecting cases).   Plaintiffs do not, however, expressly plead that REHP used the marks BRAN MAK MORN or ALMURIC in U.S. commerce.   Nor have plaintiffs argued that their use in U.S. commerce may be inferred based upon the marks' previous registration with the USPTO, see supra p.52 n.29, coupled with the pleading's allegation that REHP owns longstanding U.S. copyrights to the works in which those characters are portrayed, see Compl. ¶¶ 12-13, 17-20.

For the reasons discussed below, the Court need not decide whether REHP owns the unregistered U.S. marks and thus has standing to assert a Section 43 claim relating to BRAN MAK MORN and ALMURIC.   That determination will have no material impact on this Court's recommendation: Given plaintiffs' registered trademarks in five of the seven at-issue character names, the Complaint adequately pleads a Section 43 claim for unfair competition, but plaintiffs have not, in any event, established their entitlement to damages under the Lanham Act.   See infra pp.59-60, 74-76.

**B. Likelihood of Confusion**

Plaintiffs' submissions contain sufficient facts to support the plausibility of likely confusion.   In addressing this element,

> courts in the Second Circuit apply the eight factors set forth in [Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)]:
>      (1) the strength of plaintiff's mark;

(2) the similarity of the parties' marks;
(3) the proximity of the parties' products in the marketplace;
(4) the likelihood that the plaintiff will "bridge the gap" between
  the products;
(5) actual consumer confusion between the two marks;
(6) the defendant's intent in adopting its mark;
(7) the quality of the defendant's product; and
(8) the sophistication of the relevant consumer group.

Playtex Prods., Inc. v. Georgia Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004) (citations

omitted) (Sotomayor, J.), superseded by statute on other grounds as recognized in Starbucks

Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 107 (2d Cir. 2009).   While district

courts must make some finding on each factor, see Natural Organics, Inc. v. Nutraceutical

Corp., 426 F.3d 576, 579 (2d Cir. 2005) (collecting cases), they need not engage in an

exhaustive analysis if certain factors are dispositive, see Lapine v. Seinfeld, 375 F.App'x 81,

84 (2d Cir. 2010) (collecting cases).   Here, the similarity and competitive proximity factors

are dispositive in establishing the plausibility of likely confusion.

### 1. Similarity of the Marks

The similarity between plaintiffs' and defendant's marks weighs heavily in favor of

likely confusion.   "In assessing similarity, courts look to the overall impression created by the

[marks] and the context in which they are found and consider the totality of factors that could

cause confusion among prospective purchasers."   Gruner + Jahr USA Publ'g v. Meredith

Corp., 991 F.2d 1072, 1078 (2d Cir. 1993).   Plaintiffs proffer facts supporting that the marks

are virtually identical.   Although plaintiffs' marks often feature stylized fonts, see, e.g.,

TSDR, Case ID 3753354, *Documents - Specimen* , USPTO.GOV (Feb. 23, 2016) ("Conan

Specimen"), http://tsdr.uspto.gov, the parties' marks are also presented to consumers in plain

text, compare, e.g., id., with, e.g., Compl. Ex. F at 2.   Further, defendant's marks

incorporate the entirety of the text of plaintiffs' marks.   See generally Compl. Ex. F.   Most

importantly, the parties' marks are presented to consumers in very similar contexts.   Plaintiffs

present their marks at the point-of-sale when describing their goods, see, e.g., Conan

Specimen, and defendant affixes his marks to images of his figurines when requesting financial

support on his Kickstarter campaign, see generally Compl. Ex. G.

### 2. Competitive Proximity and Bridging the Gap

The competitive proximity and bridging the gap factors weigh in favor of likely

confusion.   "The proximity factor can apply to both the subject matter of the commerce in

which the two parties engage and the geographic areas in which they operate." Guthrie

Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 39 (2d Cir. 2016).   Further, "bridging

the gap" refers to the likelihood that the senior user (here, plaintiffs) will enter into the same

market as that of the junior user (here, defendant), where the goods are not yet in close

competitive proximity.   See id. at 45; see also Scarves by Vera, Inc. v. Todo Imps. Ltd., 544

F.2d 1167, 1174-75 (2d Cir. 1976).

In the case at bar, at least prior to the takedown notice, defendant used various of

plaintiffs' marks to advertise his figurines.   See Compl. ¶ 24.   The subject matter of

defendant's Conan and Kull figurines was similar to goods marketed by plaintiffs under those

two marks—i.e., toys.   See id. ¶¶ 11, 17; see, e.g., TSDR, Case ID 3753354 and 3522569,

Status – Goods and Services, USPTO.GOV, http://tsdr.uspto.gov (last visited on June 8,

2018).   Furthermore, plaintiffs have in the past authorized and licensed the sale of collectible

sculptures based on the at-issue characters.   See Malmberg Supp. Decl. ¶ 11.   In addition,

plaintiffs market other goods in the entertainment industry, such as books and role-playing games, under the marks DARK AGNES, EL BORAK, and SOLOMON KANE.   See Compl. ¶ 17; see, e.g., TSDR, Case ID 4206280, 3855063, and 3525806, *Status – Goods and Services*, USPTO.GOV, http://tsdr.uspto.gov (last visited on June 8, 2018).   Thus, with respect to those marks, it is plausible that a consumer familiar with plaintiffs' marks may, upon viewing defendant's goods, believe that plaintiffs had "bridged the gap."   See Scarves by Vera, 544 F.2d at 1174-75.

Likewise, the parties compete in similar channels of trade.   Plaintiffs market their goods on Amazon.com.   See, e.g., Conan Specimen.   Defendant advertises his goods on Kickstarter.com.   See Compl. ¶ 24.   The allegations thus plausibly support that the goods are in close geographic competition.   See Joules Ltd. v. Macy's Merch. Grp., Inc., 695 F.App'x 633, 637 (2d Cir. 2017) (concluding that the parties' goods were in close competition in part because the products were "sold online through the same or similar third-party websites").

### 3. The Strength of Plaintiffs' Marks

As for the strength of plaintiffs' marks, the Court concludes that, for purposes of assessing liability on this motion, the marks are moderately strong, thus weighing in favor of likely confusion.   See Compl. ¶¶ 18-19 (alleging plaintiffs' substantial investments into the goods covered by the marks and plaintiffs' regulation of third-party use); see generally GMA Accessories, Inc. v. Croscill, Inc., No. 06 Civ. 6236(GEL), 2008 WL 591803, at *4 (S.D.N.Y. Mar. 3, 2008) (Lynch, J.) (court concludes that the mark CHARLOTTE, though a fictitious personal name, was suggestive).

### 4. Defendant's Intent in Adopting The Marks

In this case, defendant's intent in adopting the challenged mark—frequently discussed in terms of good or bad faith—does not weigh in favor of or against a finding of likely confusion. In this regard, the question is not whether defendant intended to copy plaintiffs' marks but, rather, whether, in adopting his marks, defendant acted with intent to confuse.   See Starbucks, 588 F.3d at 117–18.   Specifically, this factor asks the narrow question of "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."   Arrow Fastener, 59 F.3d at 397 (quotations omitted); see Starbucks, 588 F.3d at 117 (the "only relevant intent is intent to confuse" (quoting 4 McCarthy § 23.113)).

In order to establish that a defendant acted with the relevant intent to confuse in adopting his mark, the plaintiff must show, among other things, that the defendant had knowledge—be it actual or constructive—of the plaintiff's "prior similar mark[.]"   See Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 388-89 (2d Cir. 2005) (collecting cases).   Such knowledge may be established with circumstantial evidence, such as a showing of both the defendant's sufficient access to the plaintiff's mark and a sufficient similarity between the marks at issue.   See Nikon Inc. v. Ikon Corp., 987 F.2d 91, 96 (2d Cir. 1993).

Moreover, even if a defendant did have knowledge of the plaintiff's similar mark prior to adopting his own mark, that "does not necessarily give rise to an inference of [an intent to confuse] and may be consistent with good faith."   Arrow Fastener, 59 F.3d at 397 (citations omitted).   Thus, in addition to satisfying the knowledge requirement, a plaintiff must proffer other, often circumstantial, "evidence indicating [the defendant's] intent to promote confusion

or exploit [the plaintiff's] good will or reputation" in adopting the defendant's mark.   Star

Indus., 412 F.3d at 388-89.   Courts consider the totality of circumstances in determining the

defendant's intent, such as the defendant's "[s]election of a mark that reflects the product's

characteristics[.]"   Id. at 388 (citations omitted).

　　　　Here, defendant plainly knew of plaintiffs' character names prior to his use.   See

Compl. Ex. A at 8.   Although this does not necessarily mean that defendant knew that

plaintiffs employ those names as trademarks, such a finding is sufficiently plausible for

purposes of this motion, thus satisfying the knowledge requirement.

　　　　Nevertheless, plaintiffs have not pled or proffered any other facts indicating that

defendant intended to promote confusion or exploit plaintiffs' goodwill.   In fact, plaintiffs'

own pleading contains facts supporting the contrary conclusion, i.e. that defendant expressly

disclaimed any association with plaintiffs: On his Kickstarter campaign, defendant told

prospective pledgers that his figurines were the product of his own labor, and, to the extent his

campaign used another's intellectual property, that his figurines were not licensed.[31]   See

---

[31] The body of the Complaint includes allegations that defendant acted "in an effort to mislead the
public into believing that their [sic] products are authorized and sponsored by Plaintiffs" and "to
unfairly benefit from the goodwill associated" with plaintiffs' marks.   Compl. ¶¶ 45-46.   Apart from
the conclusory nature of these claims, they ignore the disclaimer appearing in the text from the
Kickstarter campaign, which is reproduced as an exhibit to the Complaint.   See Compl. Ex. A at 8; see
also Getty Images, 797 F.Supp.2d at 439 ("Allegations are not well pleaded 'which are contrary to
uncontroverted material in the file of the case.'") (quoting Trans World Airlines, Inc. v. Hughes, 449
F.2d 51, 63 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363 (1973)); Western Heritage Ins. Co.
v. Jacobs Dev. Corp., No. 12 CV 5718, 2014 WL 297792, at *7 (E.D.N.Y. Jan. 27, 2014) (denying a
motion for default judgment where the allegations were not well-pleaded because they were
contradicted by plaintiff's evidence); Montblanc-Simplo GmbH v. Colibri Corp., 739 F.Supp.2d 143,
151 (E.D.N.Y. 2010) (explaining that even if the allegations included in a complaint are sufficient to
establish liability, they are no longer considered well-pleaded if the plaintiff provides evidence that
contradicts the allegations); In re Wildlife Ctr., Inc., 102 B.R. 321, 325 (Bankr. E.D.N.Y. 1989)
(explaining that on a motion for entry of a default judgment, allegations of fact in a complaint lose their
conclusive effect if proof offered by plaintiff demonstrates that they are false).

Compl. Ex. A at 8; see also Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, No. 3:10-cv-01238 (MPS), 2014 WL 3891287, at *7 (D. Conn. Aug. 7, 2014) (concluding that defendant's disclaimer in marketing materials and at bottom of same website that referred to plaintiff's mark "further reduce[d] any suggestion of sponsorship or endorsement"), aff'd in part, vacated in part on other grounds, and remanded, 823 F.3d 153 (2d Cir. 2016).   Defendant noted, in conjunction with that disclaimer, that, in his view, his use of another's intellectual property was unlikely because "Robert E. Howard died more than 80 years" ago with no heirs, and, as a result, any intellectual property was presumptively in the public domain.[32]   See Compl. Ex. A at 8.   Finally, defendant promptly replaced all of the character names with generic ones upon notification that the character names were protected trademarks.   See Compl. ¶¶ 27-28; id. Ex. A at 2.

Even in the light most favorable to plaintiffs, these facts support that, at worst, defendant's use was motivated by legal ignorance, not intentional deception.   Nevertheless, given the similarity of the marks as well as the posture of this motion, the pleading does not fully support defendant's good faith.   Accordingly, this factor does not weigh in favor of or against a finding of likely confusion.

### 5. Remaining Factors and Overall Assessment

Plaintiffs have failed to plead or proffer any facts relevant to the *Polaroid* factors of actual confusion, the respective quality of the parties' goods, or consumer sophistication.

---

[32] Although, in the U.S., the duration of copyright for the at-issue characters is ninety-five years from first publication, see *supra* pp.34-35, in Spain, copyright for works whose author died before 1987 apparently lasts for eighty years after the author's death, see 2 Copyright Throughout the World § 35:23 (2017).

Regardless, even if the remaining factors weigh against confusion, the similarity and competitive proximity of the marks, together with the favorable strength factor, suggest that likely consumer confusion is at least plausible.   Accordingly, this Court recommends that the District Court enter default judgment against defendant with respect to plaintiffs' federal false designation of origin claims.[33]

## RELIEF REQUESTED

Plaintiffs request an award of damages amounting to $70,000 for copyright infringement or, in the alternative, false designation of origin under the Lanham Act.   See Pl. Supp. Mem. at 7-10; but see Pl. Mem. at 8 n.5 (plaintiffs initially stated that they were not seeking damages under the Lanham Act).   This Court addresses each aspect of their request in turn, as well as plaintiffs' demand for injunctive relief.

## I.  Damages for Copyright Infringement

Plaintiffs elect an award of statutory damages, in lieu of actual damages, under section 504(a) of the Copyright Act, 15 U.S.C. § 504(a).   See Compl., *ad damnum clause*; Pl. Mem. at 8-12; Pl. Supp. Mem. at 7-9.   A plaintiff may elect statutory damages where its copyright (here, in the underlying works) was registered prior to the commencement of infringement. See 17 U.S.C. § 412(2); see *supra* pp.49-50.   To calculate an award of statutory damages, courts first determine how many works have been infringed.   See Bryant v. Media Right Prods., Inc., 603 F.3d 135, 140-42 (2d Cir. 2010).   The compensatory and deterrent values of the infringement should both be taken into account.   See id. at 144.   Another consideration is

---

[33] The final count in the Complaint, under New York law, is titled "Common Law/Unfair Competition."   See Compl. ¶¶ 50-53.   As plaintiffs do not seek any relief under this claim, it need not be addressed here.

whether this total valuation is in any way constrained by the Copyright Act's minimum and maximum limits on statutory damages.   See id. at 142-43.

### A. **Per Work Infringed**

A copyright owner may elect statutory damages "for all infringements involved in the action, with respect to any one work[.]"   See 17 U.S.C. §§ 504(a)(2), (c)(1).   Thus, statutory damages are not calculated on a per-infringement basis or per-copyright basis; rather, statutory damages are calculated on a per-work basis.   See id. § 504(c)(1).

The Copyright Act defines a "work" in connection with statutory damages slightly differently than it does for copyrightability: "[f]or purposes of [statutory damages], all the parts of a compilation or derivative work constitute one work."   Id.   The Second Circuit interprets the derivative works provision such that if "'there are several different versions of plaintiff's work, each of which commands a separate copyright,' but 'the defendant's work incorporates material covered by each of those copyrights,' the Copyright Act 'provides for but a single statutory damages award.'"   EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 94 (2d Cir. 2016) (quoting 5 Nimmer § 14.04[E][1][b]), cert. denied sub nom. Robertson v. EMI Christian Music Grp., Inc., 137 S.Ct. 2269 (2017), reh'g denied, 138 S.Ct. 43 (2017).   For example, a sound recording is a work "that results from the fixation of a series of . . . sounds," including the performance of a musical work.   17 U.S.C. § 101.   Such a sound recording is thus a derivative work based on the underlying musical work.   See EMI Christian Music, 844 F.3d at 94-95.   As a result, where a defendant infringes the copyrights in both the sound recording as well as the musical work, the plaintiff may collect statutory damages only for one work, not two.   See id. at 95.

61

Similarly, the Second Circuit interprets the compilation provision to mean that independently copyrightable works are one work for statutory damages purposes where the copyright owner issued those works in the same collective work.   See Bryant, 603 F.3d at 140-42.   For example, a music album is a collection of several sound recordings of musical works.   See id. at 140-41.   If the copyright owner issued ten sound recordings in the same album, those sound recordings would merge into a single work for statutory damages purposes, even if the defendant infringed each sound recording separately.   See id. at 140-42.   Thus, the plaintiff in such a lawsuit may collect statutory damages for one work, not ten.   See id.

In this case, plaintiffs initially asserted the infringement of—and attempted to collect statutory damages on—911 different copyrights, the overwhelming majority of which are in derivative works based on, and portray characters described in, Robert Howard's initial stories.   See Pl. Mem. at 8-12.   Because defendant's figurines only depict characters portrayed in plaintiffs' underlying works, even if defendant had infringed 911 different copyrights, those 911 separately protected works would, per the Circuit's treatment of derivative works, merge into a handful of works for statutory damages purposes.   See EMI Christian Music, 844 F.3d at 94-95.

Plaintiffs resist this conclusion, arguing that each of the underlying works in which their characters are portrayed constitutes an independently copyrighted work whose copyright has been infringed, and that they are treated as separate works for statutory damages purposes because each such work lives a "separate economic life."   See Pl. Supp. Mem. at 7-8 n.7.   In support, plaintiffs cite the Ninth Circuit's decision in Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc., 259 F.3d 1186, 1193-94 (9th Cir. 2001).   See Pl.

Supp. Mem. at 8 n.7.   However, assuming *arguendo* that all 911 copyrights in the underlying works were infringed, even those out-of-circuit courts that have adopted plaintiffs' theory have also held that, regardless of the number of underlying works in which a character is portrayed, a character lives only one separate economic life.   See Walt Disney Co. v. Powell, 897 F.2d 565, 568-70 (D.C. Cir. 1990).   Thus, even under plaintiffs' theory, they would have been entitled to collect statutory damages for only the few characters whose copyrights were infringed, not 911.

Plaintiffs' theory is flawed for a far more fundamental reason.   In 2010, the Second Circuit expressly rejected the "independent economic value" test, reasoning that it is not derived from, and is often at odds with, the statutory text of section 504.   See Bryant, 603 F.3d at 141-42.   The discredited test advocated by plaintiffs has a tendency to lead to absurd results—in the instant action, it could support a statutory damages award multiplied by 911, even though defendant created only a handful of character figurines.   See Pl. Mem. at 10 ("Plaintiffs are entitled to statutory damages of between $750 and $150,000 for each of the 911 infringed works at issue, or between $683,250 and $136,650,000.").

As a fallback position, plaintiffs argue that "courts routinely award statutory damages on a per-character basis."   See Pl. Supp. Mem. at 8 n.7.   Such a simplistic rule runs contrary to the Copyright Act's text, as well as the aforementioned Second Circuit jurisprudence. Simply put, if an infringed character is derivative of another infringed character, or if the copyright owner issued the infringed character in the same underlying work as another infringed character, those separately protected characters would merge into one work for statutory damages purposes.   See EMI Christian Music, 844 F.3d at 94-95; Bryant, 603 F.3d

63

at 140-42.   For example, under plaintiffs' theory of liability, Robert Howard would have created Bran Mak Morn and Kull together in "Kings of the Night" (from which defendant purportedly copied the characters), which was then published in the Weird Tales periodical on October 1, 1930 and registered in December 1930.   See Malmberg Supp. Decl. Ex. 4(1) at 2, 9; id. Ex. 2 at 2, 11.   Thus, despite plaintiffs' assertion that the "works were not published or registered as a single compilation," Pl. Supp. Mem. at 8 n.7, and assuming *arguendo* that plaintiffs stated a claim for copyright infringement of Bran Mak Morn, Bran Mak Morn and Kull would be one work for purposes of statutory damages, not two, see Bryant, 603 F.3d at 140-42.[34]

Regardless, here, plaintiffs have plausibly alleged that defendant committed copyright infringement with respect to three characters: El Borak, Solomon Kane, and Kull.   None of these characters is facially derivative of another.   Further, none of the characters was created or issued in the same pulp fiction magazine.   See Malmberg Supp. Decl. Ex. 6(1) at 2, 4 (El Borak first distinctly delineated in "The Daughter of Erlik Kahn" and published in the Top-Notch periodical on November 16, 1934); id. Ex. 7(1) at 2, 6 (Solomon Kane first distinctly delineated in "The Hills of the Dead" and published in the Weird Tales periodical on July 1, 1930); *supra* p.63-64 (discussing Kull).   The record accordingly supports statutory damages for three works, not seven—and certainly not for 911.

---

[34] A novel portraying independently protected characters that together form the separately protected literary work falls squarely within the definition of a collective work: "a work . . . in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."   See 17 U.S.C. § 101; Bryant, 603 F.3d at 140-42.

B. **Valuation**

Recognizing the difficulty of calculating actual damages for copyright infringement,

Congress provided copyright owners with the option of electing statutory damages.   See Van

Der Zee v. Greenidge, No. 03 Civ. 8659(RLE), 2006 WL 44020, at *1 (S.D.N.Y. Jan. 6,

2006).   "Statutory damages are not meant to be merely compensatory or restitutionary[,]" but

are also intended "to discourage wrongful conduct."   Yurman Design, Inc. v. PAJ, Inc., 262

F.3d 101, 113-13 (2d Cir. 2001) (internal quotation marks omitted); accord Cohen, 2018 WL

851374, at *16.   Courts enjoy "wide discretion . . . in setting the amount of statutory

damages."   Fitzgerald Pub. Co. v. Baylor Pub. Co., 807 F.2d 1110, 1116 (2d Cir. 1986).

    *1. Compensatory Value*

In determining the compensatory value of statutory damages, courts consider "the

expenses saved, and profits earned, by the infringer[,]" as well as "the revenue lost by the

copyright holder[.]"   Bryant, 603 F.3d at 144.   That said, in contrast to proving actual

damages, the compensatory aspect of a statutory damages award need not be precisely shown.

Cf. Cohen, 2018 WL 851374, at *16.

Here, plaintiffs initially failed to proffer any evidence relevant to the compensatory or

deterrent value of statutory damages.   See Pl. Mem at 8-12.   Because defendant's default does

not constitute an admission of facts regarding damages, and plaintiffs are required to

substantiate, with evidence, their entitlement to the relief requested, see supra p.9, this Court

directed them to supplement the record, see Order To Show Cause at 4.

In response to this Court's Order to Show Cause, the only evidence proffered by

plaintiffs regarding damages is a sworn statement from Fredrik Malmberg that plaintiffs'

character licensing revenue is typically "over $20,000 per license, which may include one or more of the characters at issue, with some licenses amounting to as much as $50,000." Malmberg Supp. Decl. ¶ 11.   Mr. Malmberg's affidavit does not specify how many separate works the referenced licensing agreements typically encompass, nor does he provide any information as to the typical duration of such a license, as compared with the relatively brief period of time that defendant's Kickstarter campaign was active.[35]   Instead, plaintiffs have presented the Court with the total revenue that they typically generate over the entire term of a licensing agreement, without any further information as to how the magnitude of a licensing fee is determined.   See id.   Notably, Mr. Malmberg does state that the referenced licenses have been for "high-end collectible sculptures based on [plaintiffs'] characters, which usually sell in the United States for $200 to $600 each," with some selling "for as much as $4,000 to $5,000 each."   Id.   In contrast, defendant was seeking pledges on his Kickstarter campaign of between $7 and $11 per plausibly infringing figurine.   See Compl. Ex. A at 3, 5.[36]   It is doubtful that defendant's profits in this niche market were at all significant.[37]   It is also

---

[35] Although the Complaint vaguely references infringing activities during "the three-year period preceding the filing of this action," see Compl. ¶ 34—an apparent reference to the Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b)—the screenshots proffered by plaintiffs suggest a period of months, not years, see generally Compl. Ex. F, DE #1-6; Malmberg Decl. Ex. 1, DE #22-1.

[36] Of defendant's figurines, the only outliers falling within Mr. Malmberg's price range are those that plaintiffs assert depict Conan, which do not plausibly infringe any of plaintiffs' copyrights.   See Compl. Ex. A at 6; *supra* pp.31-32, 44-46.

[37] Plaintiffs complain that defendant's default has made it impossible to obtain information relevant to damages.   See Pl. Supp. Mem. at 9 n.8.   However, the pledged revenue from a Kickstarter campaign is publicly available on that website.   See, e.g., *Pebble Time*, KICKSTARTER.COM, https://www.kick starter.com/projects/getpebble/pebble-time-awesome-smartwatch-no-compromises?ref=discovery ("$20,338,986 pledged of $500,000 goal").   Plaintiffs presumably secured the information concerning defendant's Kickstarter campaign prior to the takedown notice, but opted not to share it with the Court.

extremely unlikely that plaintiffs, had they licensed defendant's use, cf. D'Angelo Decl. ¶¶ 8-9; Declaration of Fredrik Malmberg ("Malmberg Decl.") (Sept. 15, 2017) ¶ 7, DE #22, would have commanded the same licensing revenue for defendant's lower-end figurines as they do for high-end collectible sculptures.

Despite the deficiencies in their evidentiary submission, plaintiffs extrapolate from that meager showing that $70,000—or "$10,000 per infringed character"—is a reasonable award of statutory damages; according to plaintiffs, an award of "approximately three times Plaintiffs' lost licensing fees, or between $60,000 and $150,000," is consistent with the approach taken and damages awarded in other copyright cases.   See Pl. Supp. Mem. at 9.   However, plaintiffs have not sustained their burden of establishing that their lost licensing fees for the three works that plausibly were infringed in any way approached $3,333 per work (a third of plaintiffs' trebled request of $10,000 per character).   To quote Judge Frederic Block, the district judge assigned to this case: "An award of statutory damages does not entitle the plaintiff to a windfall recovery."   Musical Prods., Inc. v. Roma's Record Corp., No. 05-CV-5903(FB)(VVP), 2009 WL 3052630, at *5 (E.D.N.Y. Sept. 23, 2009).   Considering all the circumstances of this case, this Court concludes that the compensatory value of statutory damages is no more than $2,000 for El Borak, Solomon Kane, and Kull each.

### 2. Deterrent Value

The value of deterrence implicates a context-specific determination.   One indicia of deterrent value is the relative status of each party.   For example, where, as in this case, the plaintiff is an established corporation that administers copyrights, and the defendant is a private individual who uses copyrighted works as a hobbyist, the deterrent value of statutory damages

is generally nominal.   Cf. Columbia Pictures Film Prod. Asia Ltd. v. Uth, No. CIV S-06-

1054 FCD DAD, 2007 WL 36283, at *3 (E.D. Cal. Jan. 4, 2007) (holding that $6,000 per

work, which was "at least" the value of plaintiff's copyright, was also sufficient to deter

defendant's willful internet piracy by defendant and others, in part because "the defendant

against whom default judgment [was] sought [was] an individual, not any type of business or

corporation"); Cengage Learning, Inc. v. Shi, No. 13cv7772-VSB-FM, 2015 WL 5167775,

at *5-6 (S.D.N.Y. Sept. 3, 2015) (reducing a requested award of $30,000 per work to $11,000

in the context of willful internet piracy, in part because the defendant was an individual, not a

corporation), adopted, No. 13 Civ. 7772 (VSB), 2017 WL 1063463 (S.D.N.Y. Mar. 21,

2017).   In such circumstances, it would likely take very little to incentivize the plaintiff to

enforce its rights and the defendant not to absorb the risk and cost of infringement over various

infringing works.[38]

In determining deterrent value, courts also consider the parties' conduct, the

"infringer's cooperation in providing evidence[,]" and "the infringer's state of mind[.]"   See

Bryant, 603 F.3d at 144.   As an initial matter, the Court notes troubling aspects of plaintiffs'

handling of this litigation, for example, in advocating legal positions that, in some instances,

are completely contrary to fundamental tenets of copyright law, see, e.g., *supra* pp.11, 62-63

(discussing plaintiffs' apparent position that their derivative works extend protection to

---

[38] Where, in contrast, the plaintiff is an individual who owns copyrights as a hobbyist and the defendant is a corporate entity that regularly commercializes copyrighted works, the deterrent value of statutory damages may be very high.   Cf., e.g., Seoul Broad. Sys. Int'l, Inc. v. Korea Int'l Satellite Broad., NO. CV 08-05119 SJO (VBKx), 2009 WL 10672770, at *7 (C.D. Cal. June 19, 2009) (awarding $100,000 per work for willful internet piracy in part because the defendants were "corporate entities for whom a substantial damages award is less severe of a burden than individual defendants").

preexisting characters, despite the Copyright Act's clear limitation, and the Southern District's clear rejection of, plaintiffs' proposition); see also Pannonia Farms, Inc. v. USA Cable, No. 03 CIV. 7841 (NRB), 2004 WL 1276842, at *9-11 (S.D.N.Y. June 8, 2004) (awarding Rule 11 sanctions for similar legal positions), aff'd in part, dismissed in part for lack of appellate jurisdiction, 426 F.3d 650 (2d Cir. 2005); and in failing to adequately analyze nuanced, developing areas of copyright law, such as the protectability of characters, see Pl. Mem. 4-12; Pl. Supp. Mem. 2-10; see, e.g. id. at 2 (noting only that characters are protectable works of authorship and that courts apply a distinctively-delineated test).

In discussing the deterrent value of an award of statutory damages, plaintiffs emphasize that, upon receipt of their takedown notice, defendant replaced their trademarked character names with generic ones, see Compl. ¶ 28, which plaintiffs characterize as defendant's attempt to conceal his copyright infringement, see id.; Pl. Supp. Mem. at 4-5.   Defendant's conduct is, however, consistent with a less nefarious purpose: to stop using their *trademarks*.   While this alteration by no means excuses the infringement up until that point, it is the kind of conduct that should be encouraged.

On the other hand, defendant left the images of his plausibly infringing figurines on Kickstarter (and possibly Facebook), compare Compl. ¶¶ 27-30, with id. Ex. A at 2; see Malmberg Decl. ¶ 8, and plaintiffs contend that he distributed a figurine of Solomon Kane after plaintiffs commenced this lawsuit, see Malmberg Decl. ¶ 8,[39] and after requesting a

---

[39]  In claiming that defendant "is still selling and shipping" infringing figurines, see Malmberg Decl. ¶ 8, plaintiffs append an April 14, 2017 screenshot from a Facebook user in Canada and member of "Conan Gaming Group," who states that he "[r]eceived [defendant's] version of a particular Howard puritan[,]" i.e., Solomon Kane, and he concludes his posting with "Thanks, Kevin!"  Malmberg Decl. Ex. 1.  Thus, contrary to plaintiffs' conclusory assertion that defendant distributed this figurine via

license from plaintiffs, <u>see</u> D'Angelo Decl. ¶ 8.   When plaintiffs sought to communicate

further, defendant never responded.   <u>See id.</u> ¶ 9.   This is the kind of behavior that copyright

law seeks to deter.

### 3.   *Balancing of Compensatory and Deterrent Value*

This case exhibits several parallels to <u>Warner Bros. v. Dae Rim Trading, Inc.</u>, 677

F.Supp. 740, 769-70 (S.D.N.Y. 1988), where the plaintiff, Warner Brothers, had likewise

demanded $10,000 per work in statutory damages for purported willful infringement.   The

court instead awarded $100 per work, primarily because of the defendants' innocent

infringement.   <u>See id.</u> at 770.   In addition, the court expressly noted that it was exercising its

discretion in this manner because "of the small size of the [defendants'] business, the relatively

small amounts involved, the large revenues and resources of Warner, the substantial profits

made by Warner from its licensing of the copyrights, as well as from the [underlying

copyrighted work] itself," <u>id.</u>, and—as the Second Circuit highlighted in affirming the award—

the plaintiff's "vexatious, oppressive, and unreasonable" legal positions advanced during

litigation, <u>Warner Bros. v. Dae Rim Trading, Inc.</u>, 877 F.2d 1120, 1126 (2d Cir. 1989)

(internal quotation marks omitted).

So too here, it is appropriate to consider plaintiffs' status in the entertainment industry

versus defendant's position as a private individual and Robert Howard fan who sculpts as a

hobby, as well as defendant's failure to appear, plaintiffs' perfunctory performance of its

obligations to the Court, and the relatively small amount of compensatory value in this case.

---

Facebook, a reasonable inference is that the Facebook user received the figurine not from defendant but
from "Kevin," presumably a fellow member of the Conan Gaming Group.

In light of these facts and defendant's failure to engage in licensing negotiations and arguable disregard for his potential infringement with respect to El Borak, Solomon Kane, and Kull, this Court concludes that $3,000 per work—150 percent of the already generous extrapolated compensatory value here—is more than adequate.

Plaintiffs urge the Court to treble the compensatory value, citing cases in which courts granted large awards, often enhanced based on multiples of three to five times the plaintiffs' licensing fees.  See Pl. Supp. Mem. at 8-9.  However, those cases involved corporate defendants, several of which infringed on large scales and hampered the copyright owners' ability to compete in their own markets.  See, e.g., id. (citing Perfect 10, Inc., v. Talisman Commc'ns Inc., No. CV99-10450 RAP MCX, 2000 WL 364813, at *2, 4-5 (C.D. Cal. Mar. 27, 2000)).  In such extreme circumstances, courts understandably take into account the desirability of general deterrence against the kind of large-scale infringement that would otherwise cripple entire industries.

Here, in contrast, defendant is a hobbyist sculptor from Spain and a fan of Robert Howard, and, in creating his figurines as a tribute to the kinds of heroes depicted in Howard's stories, he requested financial support from the community of Robert Howard fans to help fund and share his hobby.  See Compl. Ex. A at 8.  Defendant's apparently meager revenue per figurine, see id. at 5, in a market that reportedly commands much higher prices, see Malmberg Supp. Decl. ¶ 11, suggests that the motivating purpose for defendant's use was the prospect of fan play—as opposed to commercial gain, see Rebecca Tushnet, Economies of Desire: Fair Use and Marketplace Assumptions, 51 Wm. & Mary L. Rev. 513, 527 (2009) (defining "fanworks" as "works created outside the major content industries by aficionados of a source

text" and existing "because creativity arises out of a sense of play").   Such use is a far cry from the kind of purely deadweight infringement present in piracy and related cases.   Indeed, as the Supreme Court has observed: "Fan sites prompted by a book or film . . . may benefit the copyright owner."   Petrella v. Metro Goldwyn-Mayer, Inc., – U.S. –, 134 S.Ct. 1962, 1976 (2014) (Ginsburg, J.).

In other words, an award based on a three-times multiple in this case would not only make an example out of defendant, but would potentially deter fans generally from engaging in productive, creative uses: fan play and other forms of speech that promote social progress. See generally Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 & n.10 (1994) (noting that some works—although infringing—may still be socially productive); Rebecca Tushnet, Legal Fictions: Copyright, Fan Fiction, and A New Common Law, 17 Loy. L.A. Ent. L.J. 651, 684 (1997) (discussing the wrongful copying but cultural significance of using characters in fan art: "When most creative output is controlled by large corporations, freedom to modify and elaborate on existing characters is necessary to preserve a participatory element in popular culture.").[40]   In order to avoid such an untoward result, and given plaintiffs' apparent willingness to discuss authorization of defendant's use, cf. D'Angelo Decl. ¶¶ 8-9; Malmberg Decl. ¶ 7, a more just approach is to fashion a remedy that instead will deter defendant from ignoring plaintiffs' invitation to engage in license negotiations while also accounting for the vexatious legal positions advanced by plaintiffs throughout this action, see Dae Rim Trading,

---

[40] See also Rebecca Tushnet, Copyright Law, Fan Practices, and the Rights of the Author, in Fandom: Identities and Communities in a Mediated World 60, 61 (Jonathan Gray et al. eds., 2007) ("When copyright owners aggressively allege infringement, threatening fans with massive civil penalties, fans may naturally choose to shut down or hide their activities rather than stand their ground.").

877 F.2d at 1126 ("In making a statutory award, the court may consider the likelihood of profits and losses and may take into account the attitude and conduct of the parties.").

Plaintiffs also seek to justify a trebled award amounting to $70,000 by arguing that they "have incurred substantial fees and costs in connection with their attempts to restrain Defendant's unlawful conduct through Kickstarter, the filing of this action, and their repeated efforts to serve Defendant in Spain—which such fees and costs Plaintiffs do not separately seek here." Pl. Mem. at 12. To increase an award of statutory damages on the ground that the plaintiff did "not separately seek" fees and costs would, however, effectively incorporate some measure of fees and costs into damages. But the Copyright Act expressly provides a separate mechanism for prevailing parties to collect fees and costs. See 17 U.S.C. §§ 412, 504, 505; see generally Matthew Bender & Co. v. West Publ'g. Co., 240 F.3d 116 (2d Cir. 2001). Even assuming *arguendo* that plaintiffs would have been entitled to such monetary relief,[41] to fold fees and costs into a statutory damages award would circumvent the strictures of the Copyright Act.[42]

---

[41] But see Fogerty v. Fantasy, Inc., 510 U.S. 517, 534-35 & n.19 (1994) (noting factors to consider in determining whether to award fees and costs under the Copyright Act, including the reasonableness of the parties' legal positions); Dae Rim Trading, 877 F.2d at 1126 (plaintiff's withdrawal of a specific copyright claim "in effect made the defendants the prevailing parties on that issue").

[42] It may well be that plaintiffs declined to seek fees in order to avoid disclosing how little time and effort they devoted to this case, given the unlikelihood of securing a collectible judgment. Plaintiffs would be well advised to heed the Supreme Court's admonition: "It is hardly incumbent on copyright owners, however, to challenge each and every actionable infringement. And there is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on the original work, or even complements it." Petrella, 134 S.Ct. at 1976.

### C. **Minimum and Maximum Limits**

A court's award of statutory damages is constrained by the Copyright Act's minimum and maximum limits.  See 17 U.S.C. §§ 504(c)(1)-(2); D.C. Comics Inc. v. Mini Gift Shop, 912 F.2d 29, 34 (2d Cir. 1990) ("Within these limitations the court's discretion and sense of justice are controlling, but it has no discretion when proceeding under this provision to go outside of them." (quoting L.A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 106–07 (1919)).   Generally speaking, a court may award between $750 and $30,000 per work.  See 17 U.S.C. § 504(c)(1).   If, however, the defendant proves that his infringement was committed innocently, the court may award between $200 and $30,000 per work.   See id. § 504(c)(2).   If the plaintiff proves that the defendant's infringement was committed willfully, the court may award between $750 and $150,000 per work.   See id.   Here, if the District Court adopts this Court's valuation of statutory damages at $3,000 per work for El Borak, Solomon Kane, and Kull, it need not make a finding on innocent or willful infringement.[43]

### D. **Conclusion**

In sum, this Court recommends that the District Court award a total of $9,000 to REHP in statutory damages for copyright infringement.

## II. Damages for Trademark Infringement

As an alternative to statutory damages for copyright infringement, plaintiffs request an award of $70,000 in treble actual damages under the Lanham Act, 15 U.S.C. § 1117(a), for

---

[43] This Court's analysis on deterrent valuation took into account defendant's state of mind, which, although relevant to a holding on willfulness, is a separate inquiry.   Where statutory damages are within both willful and non-willful infringement limits, courts often avoid deciding willfulness, in part because such a determination is not necessary.   See M.S.R. Imports, Inc. v. R.E. Greenspan Co., No. CIV.A. 81-3223, 1983 WL 1778, at *15 (E.D. Pa. Apr. 27, 1983).

defendant's false designation of origin in violation of Section 43(a), 15 U.S.C. § 1125(a).   See Pl. Supp. Mem. at 10.   "[S]ubject to the principles of equity," a prevailing plaintiff in a Section 43(a) action is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."   15 U.S.C. § 1117(a); see Hilton v. UK Fragrances, Inc., No. 12-CV-6346 (JFB)(AKT), 2014 WL 794304, at *5 (E.D.N.Y. Feb. 25, 2014).   With respect to a defendant's profits, the plaintiff bears the burden of proffering evidence concerning the defendant's revenue, while the "defendant must prove all elements of cost or deduction claimed."   See 15 U.S.C. § 1117(a).   Alternatively, to recover its own lost profits, the plaintiff must proffer evidence of a decline in its net profits (after deducting its overhead expenses and costs), as well as proof that the defendant "actually caused the loss of those profits."   Victoria Cruises, 630 F.Supp.2d at 262-63 (collecting cases).   A court may, in its discretion, award a sum in excess of actual damages, "not exceeding three times such amount."   15 U.S.C. § 1117(a).

In this Circuit, monetary relief for a Lanham Act violation is available only upon a finding of actual confusion or intentional deception.   See Resource Developers, 926 F.2d at 139-40.   As discussed above, plaintiffs have failed to plead facts, let alone proffer evidence, sufficiently supporting actual confusion or intentional deception.   See supra pp.57-59 & n.31.[44]

---

[44] Courts in this district have observed that "[a] defendant's default may be considered as evidence of willful infringement."   Victoria Cruises, 630 F.Supp.2d at 261; accord Hilton, 2014 WL 794304, at *5; cf. 6 Patry § 22:180 & nn.19-21 (noting that, at least in copyright cases, there is a split of authority over whether a default by itself supports an inference of willfulness and opining that it should not). Plaintiffs' own uncontroverted evidence, however, militates against such an inference in this case.   See supra pp.57-59 & n.31; Schiffer Publ'g, Ltd. v. Chronicle Books, LLC, No. Civ.A.03-4962, 2005 WL 67077, at *6 (E.D. Pa. Jan. 11, 2005) (prompt cessation of infringement upon notice mitigated finding

Regardless, even if plaintiffs had made such a showing, plaintiffs have offered no proof whatsoever concerning defendant's sales, despite the fact that the revenue from defendant's Kickstarter campaign was publicly available.   See *supra* p.66 n.37.   Nor have plaintiffs proffered probative evidence as to their lost profits, overhead, or decline in revenues, for example, proof of sales and profits before and after defendant's breach.   See Hilton, 2014 WL 794304, at *7 (collecting cases).   Instead, plaintiffs' evidence of damages consists of vague assertions concerning plaintiffs' purportedly lost revenue from licenses of unspecified duration and covering unspecified characters.   See *supra* pp.65-67.   Although this evidence may have been sufficient for a rough approximation of compensatory value in assessing statutory damages for copyright infringement, an award of actual damages under the Lanham Act must be based on an evidentiary showing, not sheer speculation that plaintiffs suffered a financial loss.   See Hilton, 2014 WL 794304, at *6-8 (collecting cases and denying a damages award against a defaulting defendant, where plaintiffs submitted insufficient proof); compare with Victoria Cruises, 630 F.Supp.2d at 261-65.[45]

In any event, as plaintiffs acknowledge, they are not entitled to an award of damages under both the Copyright Act and the Lanham Act.   See Pl. Mem. at 8 n.5 (citing Tu v. TAD Sys. Tech. Inc., No. 08-CV-3822 (SLT)(RM), 2009 WL 2905780, at *3 (E.D.N.Y. Sept. 10, 2009)).   Accordingly, this Court recommends that plaintiffs' request for damages under the Lanham Act be denied.   See Hilton, 2014 WL 794304, at *8.

---

of willful copyright infringement).

[45] The absence of such evidence may well flow from the fact that, not long after defendant commenced his infringement, he received plaintiffs' takedown notice, at which point he promptly replaced all of the marks with generic ones.   See Compl. ¶ 28.

### III.   Injunctive Relief

Plaintiffs also seek injunctive relief, see Compl., *ad damnum clause*; Pl. Mem. at 13-

14; Memorandum in Support, Attachment 1 (Jan. 25, 2018) ("Proposed Injunction"), DE #29-

1 ¶ 5, specifically, that the Court enjoin defendant from using any of their copyrights or marks

and from engaging in any conduct that is likely to cause confusion, see Proposed Injunction

¶ 5.   As a preliminary matter, it bears repeating that, while well-pled allegations pertaining to

liability are deemed admitted on a motion for default judgment, allegations concerning

injunctive relief are not; rather, the plaintiff must proffer evidence to establish its entitlement

to the relief requested.   See *supra* p.9.

Although courts enjoy broad discretion in determining whether to enjoin a defendant for

copyright and/or trademark infringement, see 17 U.S.C. § 502(a); 15 U.S.C. §§ 1116, 1118,

1119; CJ Prod. LLC v. Snuggly Plushez LLC, 809 F.Supp.2d 127, 140 (E.D.N.Y. 2011),

their discretion is constrained by four prerequisites to such relief, see eBay Inc. v.

MercExchange, L.L.C., 547 U.S. 388, 391 (2006).   Specifically, a plaintiff must demonstrate

> (1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as monetary damages, are inadequate to
>     compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and
>     defendant, a remedy in equity is warranted; and
> (4) that the public interest would not be disserved by a permanent injunction.

Id. (collecting cases).

In eBay, a patent case in which the jury had found the defendant liable for

infringement, the Supreme Court held that courts may not grant permanent injunctions merely

because the plaintiff succeeds in proving a defendant's liability; the plaintiff must additionally

satisfy the above four equitable factors.   See id. at 393-94.   The Court rejected the use of

categorical rules or presumptions in performing this equitable analysis, see id. at 393, and

subsequently reiterated these principles in the context of a motion for preliminary injunction in

an environmental law case, see Winter v. Natural Resources Defense Council, Inc., 555 U.S.

7, 20-24 (2008).

Thereafter, in Salinger v. Colting, the Second Circuit clearly signaled that the *eBay*

standard is not limited to patent cases.   See 607 F.3d 68, 78 n.7 (2d Cir. 2010).   The Circuit

held that *eBay* applies to copyright infringement cases, and that courts may not presume

irreparable harm simply because the copyright owner established infringement.   See id. at 82.

Further, the Court noted in dicta that "we see no reason that *eBay* would not apply with equal

force to an injunction in *any* type of case[,]" and cautioned lower courts to eschew general

rules or presumptions in assessing requests for injunctive relief.   See id. at 78 n.7 (emphasis

in original).   Although the Second Circuit has yet to expressly decide whether *eBay* extends to

trademark infringement cases, see U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 511

F.App'x 81, 85 (2d Cir. 2013), district courts in this Circuit have generally followed

*Salinger*'s lead, reasoning that "there appears to be no principled reason not to adopt the newly

announced standard in the trademark context[,]" U.S. Polo Ass'n, Inc. v. PRL USA Holdings,

Inc., 800 F.Supp.2d 515, 539 (S.D.N.Y. 2011) (collecting cases), aff'd, 511 F.App'x 81 (2d

Cir. 2013); accord Balady v. Elhindi, No 13CV855 (SJ)(RER), 2014 WL 7342867, at *11

(E.D.N.Y. Dec. 23, 2014).

Accordingly, even in the context of a motion for default judgment, a plaintiff seeking a

permanent injunction in a copyright or trademark infringement action must make the requisite

showing on each of the four *eBay* factors.   See Am. Auto. Ass'n, Inc. v. Limage, 15-CV-7386 (NGG)(MDG),2016 WL 4508337, at *6 (E.D.N.Y. Aug. 26, 2016).   A plaintiff may not rely on its showing of wrongful copying or a likelihood of confusion, but must, among other things, establish that it actually has been irreparably harmed or, at the very least, that such harm is imminent.   See eBay, 547 U.S. at 391 ("A plaintiff must demonstrate (1) that it *has suffered* an irreparable injury . . . ." (emphasis added)); Gowanus Dredgers v. Baard, No. 11-CV-5985 (PKC), 2013 WL 6667361, at *11 (E.D.N.Y. Dec. 17, 2013) (the mere possibility of irreparable harm was insufficient to warrant a permanent injunction; plaintiff at least had to show that its harm was imminent (citing MacIssac v. Town of Poughkeepsie, 770 F.Supp.2d 587, 593 (S.D.N.Y. 2011)); but see Pl. Mem. at 14 n.7 (citing a pre-eBay case for the proposition that a "mere possibility" of infringement was sufficient to support a permanent injunction).

In the wake of eBay, the Second Circuit has found irreparable injury in copyright cases in a number of distinguishable contexts.   For example, in WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 285-87 (2d Cir. 2012), the Circuit held that the district court did not abuse its discretion in determining that the plaintiffs had demonstrated irreparable injury where the nature of the defendant's infringement would have substantially diminished the value of the plaintiff's copyright.   See id.[46]   In light of the specific way that advertisers calculated fees paid to the plaintiff, the Circuit sustained the grant of a preliminary injunction, holding that "there [was] no assurance that damages could be reasonably calculated at trial."   Id. at 286.

---

[46] There, the defendant was attempting to retransmit over the internet the plaintiff's live programing in a different time zone before the plaintiff could itself transmit to those locations, thereby completely diverting viewers away from watching the plaintiff's programming.   See ivi, 691 F.3d at 285-86.

Courts have also found irreparable injury in trademark cases in a number of contexts, such as where the plaintiff demonstrated that it had in fact lost control over its reputation. See, e.g., Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co., No. 15-CV-1092 JMF, 2015 WL 845711, at *6–7 (S.D.N.Y. Feb. 26, 2015).   But the Second Circuit has been careful to require that conclusions regarding a loss of control be based on factual findings "and not simply the product of a legal presumption" arising from a likelihood of confusion.   See U.S. Polo Ass'n, 511 F.App'x at 85.   Hence, a plaintiff was found to have lost control over its reputation where it established that the defendant used the plaintiff's marks and trade dress after the plaintiff refused to enter into a licensing agreement specifically because the defendant did not satisfy the plaintiff's high standards of use.   See, e.g., Barefoot Contessa Pantry, 2015 WL 845711, at *6–7.   In such circumstances, the plaintiff had sufficiently demonstrated that confused consumers would have imputed the inferior presentation of the defendant's goods onto the plaintiff.   Similarly, courts have also found irreparable injury where, for example, the plaintiff proved that it had lost goodwill because the quality of the defendant's goods affixed with the infringing mark was materially inferior to that of the plaintiff's.   See, e.g., Am. Auto. Ass'n, 2016 WL 4508337, at *6–7.   Again, in such circumstances, the plaintiff had sufficiently demonstrated that confused consumers would have imputed the inferior quality of the defendant's goods onto the plaintiff.

In short, a plaintiff seeking a permanent injunction in a copyright and/or trademark infringement case must come forward with some evidence linking wrongful copying and likely confusion with past or imminent irreparable injury, and any grant of equitable relief must be tied to the specific facts of the case before the court.   See eBay, 547 U.S. at 392-94; see also

Guthrie Healthcare Sys., 826 F.3d at 47.   Put differently, it is insufficient for a plaintiff to rely on argument alone to establish irreparable injury.   Yet, plaintiffs' submissions do little more than that, offering no evidence to show that they have been irreparably harmed. Notably, plaintiffs do not even reference eBay, Salinger, or any other controlling law regarding their obligation to demonstrate irreparable injury, let alone any of the other *eBay* factors.   See Pl. Mem. at 13-14.   Moreover, courts have found that a plaintiff's award of damages that remedies future harm "undermines [the plaintiff's] claim of irreparable injury moving forward."   SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 386 (4th Cir. 2017).   This principle applies with particular force here, where defendant promptly ceased much of his infringing activity upon receiving plaintiffs' takedown notice, see Compl. ¶¶ 27-28; id. Ex. A at 2; and where the recommended award of statutory damages includes an amount for licensing fees covering continuing conduct, see *supra* pp.65-67.

Ignoring this caselaw, and highlighting defendant's failure to appear in this action, plaintiffs merely argue that, absent injunctive relief, defendant's infringing conduct will continue.   See Pl. Mem. at 14.   But plaintiffs' argument begs the question of whether it has in fact been irreparably injured; even assuming *arguendo* that defendant is likely to continue his infringing conduct, a finding that plaintiffs have plausibly alleged wrongful copying and likely confusion does not, without the benefit of a discredited presumption, satisfy plaintiffs' obligation to establish actual past or imminent injury under the *eBay* four-factor test. Therefore, the Court concludes that plaintiffs have not established that they will imminently suffer irreparable injury or that remedies at law are inadequate.

Further, balancing the competing hardships weighs heavily against enjoining defendant's use.   Courts have held that where, as is the case here, part of a plaintiff's award of damages includes damages for future harm, a permanent injunction would work an undue hardship on the defendant.   See SAS Inst., 874 F.3d at 387-88.   That hardship is magnified where defendant is an individual who apparently has minimal commercial interest in his use of plaintiffs' characters.   See supra pp.65-67.

Moreover, granting an injunction in this case might well generally chill the use of plaintiffs' characters in other fanworks that qualify as fair use or at least as productive uses and might thus run counter to the public's interest.   As the Supreme Court noted in a case that predated eBay, Campbell v. Acuff-Rose Music, Inc., "the goals of the copyright law, 'to stimulate the creation and publication of edifying matter,' are not always best served by automatically granting injunctive relief . . . ."   510 U.S. at 578 n.10 (quoting Pierre N. Leval, Toward A Fair Use Standard, 103 Harv. L. Rev. 1105, 1132-34 (1990)).   In other words, "while in the 'vast majority of cases, [an injunctive] remedy is justified because most infringements are simple piracy,' such cases are 'worlds apart from many of those raising reasonable contentions of fair use' where 'there may be a strong public interest in the publication of the secondary work [and] the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found' . . . ."   Id.; see Salinger, 607 F.3d at 80-83 (while agreeing with the district court that the defendant's derivative work was likely infringing and unlikely a fair use, the Second Circuit vacated and remanded the granting of a preliminary injunction, in part because the district court had not taken into account the "public's interest in free expression," which "is significant and is

82

distinct from the parties' speech interests"); see also Abend v. MCA, Inc., 863 F.2d 1465, 1478-80 (9th Cir. 1988) (holding that an injunction would be an inappropriate remedy for copyright infringement where it would cause public injury and where the plaintiff could be adequately compensated by an award of damages or continuing royalty), aff'd sub nom. Stewart v. Abend, 495 U.S. 207 (1990); accord Silverstein v. Penguin Putnam, Inc., 368 F.3d 77, 84-85 (2d Cir. 2004).

Here, defendant's creation of his figurines, albeit a minimally commercial, infringing use, appears to implicate some degree of socially productive fanwork.  See supra pp.71-72. In the circumstances of this case, an award of monetary relief will adequately protect the interests of plaintiffs, defendant, and the public—including other Robert Howard fans.

Finally, even if plaintiffs had made the necessary showing, the Court questions the scope of plaintiffs' requested injunction.  See Guthrie Healthcare Sys., 826 F.3d at 47 (noting that "a permanent injunction must be narrowly tailored to fit specific legal violations and that a court should not impose unnecessary burdens on lawful activity" but should "frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement" (internal quotation marks and quotations omitted)); Fresh Del Monte Produce Inc. v. Del Monte Foods Co., 933 F.Supp.2d 655, 660-62 (S.D.N.Y. 2013) (plaintiffs in Lanham Act cases must satisfy the four-factor eBay test to warrant a permanent injunction, which, even if warranted, must be narrowly tailored to fit the "necessities of the particular case").  For example, in addition to requesting that the Court enjoin defendant from using plaintiffs' marks, plaintiffs request that the Court enjoin defendant from using any confusingly similar mark or otherwise engaging in activity that will likely confuse.  See Proposed

83

Judgment ¶¶ 5(b)-(c).   Such an injunction is unduly vague and defective in these circumstances.   See Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 748-50 (2d Cir. 1994); Beastie Boys v. Monster Energy Co., 87 F.Supp.3d 672, 680 (S.D.N.Y. 2015); Fed. R. Civ. P. 65(d); see also Ptak Bros. Jewelry, Inc. v. Ptak, No. 06 Civ. 13732(DC), 2009 WL 1514469, at *1 (S.D.N.Y. June 1, 2009) (Chin, J.).

For all of these reasons, this Court recommends that plaintiffs' request for equitable relief be denied.   See Sprint Nextel Corp. v. Welch, No. 1:13-cv-01174-AWI-SAB, 2014 WL 2106683, at *1 (E.D. Cal. May 20, 2014) (adopting the magistrate judge's recommendation that the plaintiff's request for equitable relief in a Lanham Act case be denied despite the entry of default judgment on liability, where the plaintiff's showing consisted of the factual allegations in the complaint and legal argument, and the plaintiff requested relief that was overbroad); cf. Gowanus Dredgers, 2013 WL 6667361, at *11 ("[T]he theoretical possibility that Plaintiff may be losing donations because of the alleged Trademark infringement is too speculative to give Plaintiff standing to sue."); see also TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 504 (2d Cir. 2014) ("Courts may deny requests for injunctive relief, an equitable remedy, for various reasons unrelated to the validity of plaintiff's claim.").

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that plaintiffs' motion for default judgment be granted in part and denied in part.   More specifically, the District Court should enter default judgment on REHP's copyright claim only as to El Borak, Solomon Kane, and Kull, and should award REHP statutory copyright damages of $9,000; deny CPI's request for default judgment on its copyright claim; enter default judgment on liability on

plaintiffs' Lanham Act claim; deny plaintiffs' request for treble actual damages under the

Lanham Act; and deny plaintiffs' request for a permanent injunction.

Any objections to this Report and Recommendation must be filed with the Honorable

Frederic Block on or before **June 25, 2018**.   Failure to file objections in a timely manner may

waive a right to appeal the District Court order.   See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 6(d), 72.

The Clerk is respectfully requested to docket this Report and Recommendation into the

ECF court file and to email a copy to defendant.   Plaintiffs are directed to promptly serve a

hard copy on defendant, and to file proof of service.

**SO ORDERED.**

**Dated: Brooklyn, New York**
**June 8, 2018**

/s/        **Roanne L. Mann**
**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**